MALLARD *v.* UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA ET AL.

No. 87–1490.   Argued February 28; 1989—Decided May 1, 1989

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined.   KENNEDY, J., filed a concurring opinion, *post*, p. 310.   STEVENS, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined, *post*, p. 311.

*John E. Mallard, pro se,* argued the cause and filed briefs for petitioner.

*Gordon E. Allen,* Deputy Attorney General of Iowa, argued the cause for respondents.   With him on the brief were *Thomas J. Miller,* Attorney General, and *Steve St. Clair,* Assistant Attorney General.*

---

*Diane C. Yu* and *Jack W. Londen* filed a brief for the State Bar of California as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Association of the Bar of the City of New York by *Alexander R. Sussman, Ogden Northrop Lewis,* and *John G. Koeltl;* and for the Legal Services Corporation of Iowa by *Martin Ozga.*

*Gerald F. Uelmen* and *Ephraim Margolin* filed a brief for California Attorneys for Criminal Justice et al. as *amici curiae.*

JUSTICE BRENNAN delivered the opinion of the Court.

We are called upon to decide whether 28 U. S. C. § 1915(d) authorizes a federal court to require an unwilling attorney to represent an indigent litigant in a civil case. We hold that it does not.

I

Section 1915(d) provides: "The court may request an attorney to represent any [person claiming *in forma pauperis* status] unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." In *Nelson* v. *Redfield Lithograph Printing*, 728 F. 2d 1003, 1005 (1984), the Court of Appeals for the Eighth Circuit ordered "the chief judge of each district to seek the cooperation of the bar associations and the federal practice committees of the judge's district to obtain a sufficient list of attorneys practicing throughout the district so as to supply the court with competent attorneys who will serve in pro bono situations," such as *in forma pauperis* proceedings conducted under 28 U. S. C. § 1915. The District Court for the Southern District of Iowa heeded the Court of Appeals' command. Under the system in force since February 1986, once the District Court has determined that an indigent party qualifies for representation under § 1915(d), the Clerk of the Court forwards a copy of the court file to the Volunteer Lawyers Project (VLP), a joint venture of the Legal Services Corporation of Iowa and the Iowa State Bar Association. The VLP keeps a copy of a roster prepared by the District Court of all attorneys admitted to practice before the court and in good standing. After deleting the names of lawyers who have volunteered for VLP referrals of *pro bono* state-court cases, the VLP selects lawyers from the list nonalphabetically for § 1915(d) assignments.[1] Lawyers who

---

[1] In February 1986, the Iowa State Bar Association sent a letter to all lawyers licensed to practice before the United States District Courts for the Northern and Southern Districts of Iowa describing the referral system. According to the letter, 130 appointments were made between June

are chosen under the plan may apply to the District Court for reimbursement of out-of-pocket costs. They may also keep any fee award provided by statute, but are not guaranteed even minimal compensation for their own services. The VLP assists lawyers assigned to litigate in areas of the law with which they are unfamiliar by providing written materials, holding periodic seminars, and facilitating consultations with experienced attorneys.

Petitioner Mallard was admitted to practice before the District Court in January 1987, and entered his first appearance the following month. In June 1987 he was asked by the VLP to represent two current inmates and one former inmate who sued prison officials under 42 U. S. C. § 1983, alleging that prison guards and administrators had filed false disciplinary reports against them, mistreated them physically, and endangered their lives by exposing them as informants. After reviewing the case file, Mallard filed a motion to withdraw with the District Court. In his motion, petitioner stated that he had no familiarity with the legal issues presented in the case, that he lacked experience in deposing and cross-examining witnesses, and that he would willingly volunteer his services in an area in which he possessed some expertise, such as bankruptcy and securities law. App. 4–8. The VLP opposed petitioner's motion, claiming that he was competent, that he had an ethical duty to do whatever was necessary to try the case, and that permitting an exception to the rule of assignment would create a dangerous precedent. A Magistrate denied petitioner's motion.

Mallard then appealed to the District Court. Although he reiterated his unfamiliarity with § 1983 actions, he contended that he should be permitted to withdraw not because of his inexperience in interpreting the statute and its case law, but

---

1984 and June 1985. The combined lists for both Districts embraced roughly 3,500 lawyers. Each lawyer was eligible to be chosen every third year, making her odds of being selected roughly 1 in 9 in those years. App. to Brief for Respondents 1–5.

because he was not a litigator by training or temperament. Forcing him to represent indigent inmates in a complex action requiring depositions and discovery, cross-examination of witnesses, and other trial skills, Mallard asserted, would compel him to violate his ethical obligation to take on only those cases he could handle competently and would exceed the court's authority under § 1915(d).  *Id.*, at 19–29.  In an accompanying affidavit, Mallard added: "I do not like the role of confronting other persons in a litigation setting, accusing them of misdeeds, or questioning their veracity.  Because of my reluctance to become involved in these activities, I do not feel confident that I would be effective in litigating a case such as the instant case."  *Id.*, at 38.

Unmoved, the District Court upheld the Magistrate's decision.  App. to Pet. for Cert. 2a–4a.  Based on the quality of petitioner's brief in support of his motion to withdraw, the court pronounced him competent, notwithstanding his very slight acquaintance with trial litigation.  The court also held that § 1915(d) empowers federal courts to make compulsory appointments in civil actions.  In November 1987, Mallard sought a writ of mandamus from the Court of Appeals for the Eighth Circuit to compel the District Court to allow his withdrawal.  The Court of Appeals denied the petition without opinion.  *Id.*, at 1a.  We granted certiorari to resolve a conflict among the Courts of Appeals over whether § 1915(d) authorizes compulsory assignments of attorneys in civil cases.[2] 488 U. S. 815 (1988).  We now reverse.

## II

Interpretation of a statute must begin with the statute's language.  *E. g., United States* v. *Ron Pair Enterprises,*

---

[2] Compare, *e. g., Caruth* v. *Pinkney,* 683 F. 2d 1044, 1049 (CA7 1982) (§ 1915(d) does not authorize compulsory appointments), cert denied, 459 U. S. 1214 (1983); *United States* v. *30.64 Acres of Land,* 795 F. 2d 796, 801–803 (CA9 1986) (same), with, *e. g., Peterson* v. *Nadler,* 452 F. 2d 754, 757 (CA8 1971) (§ 1915(d) permits mandatory assignments); *Whisenant* v. *Yuam,* 739 F. 2d 160, 163, n. 3 (CA4 1984) (same).

*Inc.*, 489 U. S. 235, 241 (1989); *Landreth Timber Co.* v. *Landreth*, 471 U. S. 681, 685 (1985). Section 1915(d)'s operative term is "request": "The court may request an attorney to represent" an indigent litigant. The import of the term seems plain. To request that somebody do something is to express a desire that he do it, even though he may not generally be disciplined or sanctioned if he declines. Of course, somebody who frequently refuses another person's requests might not win that person's favor. A soldier who regularly fails to fulfill his superior's requests might not rise in the ranks as rapidly as would someone who was more compliant. But somebody who refuses a request, as the word is ordinarily used, may not be penalized formally for doing so, as a soldier who disobeyed orders might be court-martialed. In everyday speech, the closest synonyms of the verb "request" are "ask," "petition," and "entreat." See, *e. g.*, Webster's New International Dictionary 1929 (3d ed. 1981); Black's Law Dictionary 1172 (5th ed. 1979). The verbs "require" and "demand" are not usually interchangeable with it.

There is little reason to think that Congress did not intend "request" to bear its most common meaning when it used the word in § 1915(d). Although "request" may double for "demand" or "command" when it is used as a noun, particularly when employed as a term of art in connection with wills, trusts, and probate proceedings, its ordinary and natural signification when used as a verb was precatory when Congress enacted the provision now appearing at 28 U. S. C. § 1915(d) in 1892. See, *e. g.*, Black's Law Dictionary 1027 (1st ed. 1891); 2 B. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 415 (1879); 7 Judicial and Statutory Definitions of Words and Phrases 6120–6122 (West 1905).

Perhaps the clearest proof that Congress did not intend § 1915(d) to license compulsory appointments of counsel is the contrast between that subsection and § 1915(c). Whereas § 1915(d) merely empowers a court to *request* an attorney

to represent a litigant proceeding *in forma pauperis*, § 1915(c)—adopted at the very same time as § 1915(d)—treats court officers and witnesses differently: "The officers of the court *shall* issue and serve all process, and perform all duties in such cases. Witnesses *shall* attend as in other cases, and the same remedies shall be available as are provided for by law in other cases." (Emphasis added.) Congress evidently knew how to require service when it deemed compulsory service appropriate. Its decision to allow federal courts to *request* attorneys to represent impoverished litigants, rather than command, as in the case of court officers, that lawyers *shall* or *must* take on cases assigned to them, bespeaks an intent not to authorize mandatory appointments of counsel.[3]

An examination of state statutes governing *in forma pauperis* proceedings at the time § 1915(d) became law bolsters this conclusion. By the late 19th century, at least 12 States had statutes permitting courts to assign counsel to represent indigent litigants. The Congress that adopted § 1915(d) was undoubtedly aware of those statutes, for the brief and otherwise unilluminating Report of the House Judiciary Committee states that the bill containing § 1915(d) was designed to enable persons unable to afford legal representation to avail themselves of the courts, as "[m]any humane and enlightened States" that had similar laws allowed them to do. H. R. Rep. No. 1079, 52d Cong., 1st Sess., 2 (1892). None of those state statutes, however, provided that a court could merely *request* that an attorney serve without compensation. All of

---

[3] The sole reference to compulsory service in the short floor debate in the House supports this inference. In response to a statement by Representative Stone that the bill would compel court officers to work without pay, Representative Culberson said: "We are simply in these cases of charity and humanity compelling these officers, all of whom make good salaries, to do this work for nothing. That is all the bill does. There may be one such case upon a docket of five hundred; and they are not required to do much *ex-officio* service." 23 Cong. Rec. 5199 (1892). No one spoke of compelling lawyers to serve without compensation.

them provided instead that a court could *assign* or *appoint* counsel. Ark. Stat. § 1053 (1884) (assign); Ill. Rev. Stat., ch. 26, § 3 (1845) (assign); Ind. Rev. Stat., Vol. 2, pt. 2, ch. 1, Art. 2, § 15 (1852) (assign); Ky. Stat. § 884 (1915) (Act of May 27, 1892) (assign); Mo. Rev. Stat. § 2918 (1889) (assign); N. J. Gen. Stat., Vol. 2, Practice § 369, p. 2598 (1896) (enacted 1799) (assign); 1876 N. Y. Laws, ch. 448, Art. 3, § 460 (assign); 1869 N. C. Pub. Laws, ch. 96, § 2 (assign); Tenn. Code § 3980 (1858) (appoint and assign); Tex. Rev. Stat., Art. 1125 (1879) (enacted 1846) (appoint); Va. Code Ann. § 3538 (1904) (appeared in 1849 Code) (assign); W. Va. Code, ch. 138, § 1 (1891) (assign). Cf. N. Mex. Comp. Laws § 2289 (1884) (judge may appoint attorney to represent Territory if Territory's attorneys are unable to attend by reason of sickness or inability); Nev. Comp. Laws § 3126 (1900) (court may appoint attorney to appear on behalf of absent defendant in certain contract actions). To the extent that the "assignment" or "appointment" of counsel denotes the imposition of a duty to undertake representation that courts may enforce, Congress' decision to allow the federal courts to do no more than "request" attorneys to serve, in full awareness of more stringent state practices, seems to evince a desire to permit attorneys to decline representation of indigent litigants if in their view their personal, professional, or ethical concerns bid them do so.

Moreover, the extent to which state statutes empowering courts to "assign" or "appoint" counsel in *in forma pauperis* proceedings also authorized courts to sanction attorneys who refused to serve without compensation is unclear, because few appointments were made pursuant to those statutes, because many legal proceedings went unrecorded, and because lawyers seem rarely to have balked at courts' assignments. It is nevertheless significant that no reported decision exists in the above States prior to 1892 holding that a lawyer could not decline representation without compensation, see Shapiro, The Enigma of the Lawyer's Duty to Serve, 55

N. Y. U. L. Rev. 735, 749–762 (1980) (hereinafter Shapiro),
for it suggests that Congress did not intend to replicate a sys-
tem of coercive appointments when it enacted § 1915(d), par-
ticularly when it used the weaker verb "request" in place of
the words "assign" or "appoint." English precedents from
the 15th to the late 19th century, on which the States appar-
ently relied and which Congress might have had in mind,
were equally murky. Few appointments were made in
either civil or criminal cases; and although sergeants-at-law
were expected to represent indigent persons upon demand of
the court, they held public office and were court officers in a
much fuller sense than advocates who appeared before it.
Again, no reported decisions involve the imposition of sanc-
tions on lawyers unwilling to serve. See *id.*, at 740–749.
Professor Shapiro concludes: "To justify coerced, uncompen-
sated legal services on the basis of a firm tradition in England
and the United States is to read into that tradition a story
that is not there." *Id.*, at 753.[4]

---

[4] In claiming that "state courts had statutory authority to order lawyers
to render assistance to indigent civil litigants in a dozen States" in 1892,
*post*, at 314, the dissent ignores recent scholarship questioning the extent
of that authority and casting doubt on unqualified and poorly documented
assertions of its existence by contemporary writers, such as Cooley. See
Shapiro 751–753. In view of the complete absence of precedent evincing
state courts' power to sanction attorneys unwilling to provide free repre-
sentation, the dissent's surmise that Congress meant to grant this power to
federal judges, and indeed to confer on them as much authority as judges in
the "most progressive" States exercised, *post*, at 314, seems somewhat ex-
travagant. Lower federal-court decisions construing § 1915(d) within a
decade of its enactment, on which the dissent relies, see *id.*, at 316, cer-
tainly do not support this inference. On the contrary, they tell against it.
In *Whelan* v. *Manhattan R. Co.*, 86 F. 219, 221 (CC SDNY 1898), cited
approvingly a year later regarding attorney assignments in *Brinkley* v.
*Louisville & N. R. Co.*, 95 F. 345, 353 (CC WD Tenn. 1899), the court said:
"If the attorney who brought the action is willing to continue the litigation
[without compensation, unless the plaintiff prevails and recovers an
amount sufficient to pay him a fair fee], he will be assigned to represent
plaintiff; if not, the court will find some other attorney to prosecute her

Comparing § 1915(d) with similar federal statutes strengthens our conclusion that Congress did not authorize mandatory appointments. The sole federal statute antedating § 1915(d) that provided for court-ordered representation allowed a capital defendant "to make his full defence by counsel learned in the law" and stated that "the court before whom such person shall be tried, or some judge thereof, shall . . . immediately, upon his request . . . *assign* to such person such counsel, not exceeding two, as such person shall de-

case." Courts at the time evidently believed that attorneys were free to decline a judge's request to represent an indigent plaintiff under § 1915(d).

The dissent's claim that Congress intended § 1915(d) to mirror state statutes permitting coercive appointments seems particularly tenuous when Congress departed from States' use of the verbs "appoint" and "assign," and when it plainly distinguished between attorneys and salaried court officers in the text of the statute. To be sure, the statute was introduced in both Houses as an Act "providing when plaintiff may sue as a poor person, and when counsel shall be assigned by the court." 23 Cong. Rec. 5199, 6264 (1892). But the word "assign" does not appear in the statute itself or the relevant section of the United States Code, and it is the statutory language that guides our resolution of this case. The dicta cited by the dissent, see *post*, at 312–314, regarding lawyers' obligation as members of a bar to represent poor *criminal* defendants do not appreciably strengthen its argument that *this statutory provision* licenses compulsory appointments in *civil* cases, whatever force they might lend to the contention that federal courts possess inherent authority to compel lawyers to serve or that attorneys are under a strong ethical obligation to render assistance.

The dissent's further argument that Mallard's "admission to practice implicitly included an obligation to participate" in the District Court's program for providing representation to indigent civil litigants because the program was established before he joined the bar, see *post*, at 317, is equally unavailing. The District Court's program derived its putative authority from § 1915(d) alone. See *Nelson* v. *Redfield Lithograph Printing*, 728 F. 2d 1003 (CA8 1984). Whether Mallard incurred an obligation to represent indigent civil litigants by virtue of his membership in the bar therefore depends upon whether § 1915(d) in fact authorizes compulsory representation. To argue the reverse—that Mallard assumed an obligation by accepting membership in the bar after the program was in place, hence the program, and derivatively Mallard's obligation, must have a legitimate statutory ground in § 1915(d)—is simply bootstrapping.

sire. . . ."   Act of April 30, 1790, ch. 9, § 29, 1 Stat. 118, presently codified as amended at 18 U. S. C. § 3005 (emphasis added).   Thus, when Congress enacted § 1915(d), the verb "assign" was already part of the federal statutory lexicon; Congress' decision to depart from prior usage in fashioning a rule for civil cases [5] involving indigent litigants might be taken to display a reluctance to require attorneys to serve, even though Congress apparently mandated service in the much more serious case of criminal defendants facing the death penalty. [6]

This inference finds additional support in Congress' actions subsequent to § 1915(d)'s enactment.   Every federal statute still in force that was passed after 1892 and that authorizes courts to provide counsel states that courts may "assign" or "appoint" attorneys, just as did the 1790 capital representation statute.   See 18 U. S. C. § 3006A (1982 ed. and Supp. V) (appoint; criminal defendant); 18 U. S. C. § 3503(c) (assign; criminal defendant at deposition to preserve testimony); 18 U. S. C. § 4109 (appoint; proceeding to verify offender's consent to transfer to or from United States); 25 U. S. C. § 1912(b) (appoint; Indian child custody proceedings); 42 U. S. C. § 1971(f) (assign; defendant in voting rights case); 42

---

[5] Although § 1915(d) now pertains to "the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein," 28 U. S. C. § 1915(a), as originally drafted it apparently applied only to suits commenced by an indigent person.   Act of July 20, 1892, ch. 209, § 1, 27 Stat. 252.   Since a private individual may not institute a criminal prosecution, the scope of § 1915(d) was limited to persons bringing civil suits.   The legislative history of the bill containing § 1915(d) corroborates this inference.   The House Report refers exclusively to litigation over property.   See H. R. Rep. No. 1079, 52d Cong., 1st Sess., 1 (1892).   And the floor debate in the House speaks only of poor persons suing as plaintiffs.   See 23 Cong. Rec. 5199 (1892).

[6] We do not decide today whether, or under what conditions, 18 U. S. C. § 3005 or any other federal statute providing for the "assignment" or "appointment" of counsel authorizes federal courts to compel an unwilling attorney to render service.   Nor do we offer an opinion on the constitutionality of compulsory assignments.

U. S. C. § 2000a–3(a) (appoint; complainant seeking injunction under civil rights laws); 42 U. S. C. § 2000e–5(f)(1) (appoint; Title VII complainant); 42 U. S. C. § 3413(1) (assign; commitment of narcotics addict); see also Fed. Rule Crim. Proc. 44 (assign; criminal defendant); cf. 10 U. S. C. § 827 (courts-martial shall "detail" trial counsel and defense counsel). Congress' decision to promulgate these apparently coercive representation statutes when § 1915(d) was already on the books and after it had been extended to cover criminal as well as civil cases, see Act of June 25, 1910, Pub. L. 317, ch. 435, 36 Stat. 866,[7] suggests that § 1915(d)'s use of "request" instead of "assign" or "appoint" was understood to signify that § 1915(d) did not authorize compulsory appointments. In any case, Congress' enactments after 1892 afford no reason to believe that the plain meaning of § 1915(d) is not its intended meaning.

Contrary to respondents' assertion, Brief for Respondents 7–9, construing § 1915(d) to allow courts to ask but not compel lawyers to represent indigent litigants does not render § 1915(d) a nullity. Respondents contend that statutory authorization is unnecessary for a court simply to ask an attorney to represent someone; § 1915(d) would be superfluous if it did no more than that, and thus it must be read to confer coercive power upon the federal courts. Respondents' major premise, however, is too strong. Statutory provisions may simply codify existing rights or powers. Section 1915(d), for example, authorizes courts to dismiss a "frivolous or mali-

---

[7] These federal statutes empowering courts to assign or appoint counsel were all passed well after § 1915 attained its present broad coverage. See Act of Aug. 10, 1956, Pub. L. 1028, § 827, 70A Stat. 46, 10 U. S. C. § 827; Pub. L. 88–455, 78 Stat. 552 (1964), 18 U. S. C. § 3006A; Pub. L. 91–452, 84 Stat. 934 (1970), 18 U. S. C. § 3503(c); Pub. L. 95–144, 91 Stat. 1218 (1977), 18 U. S. C. § 4109; Pub. L. 95–608, 92 Stat. 3071 (1978), 25 U. S. C. § 1912(b); Pub. L. 88–352, 78 Stat. 241 (1964), 42 U. S. C. § 1971(f); Pub. L. 88–352, 78 Stat. 244 (1964), 42 U. S. C. § 2000a–3(a); Pub. L. 88–352, 78 Stat. 259 (1964), 42 U. S. C. § 2000e–5(f)(1); Pub. L. 89–793, 80 Stat. 1445 (1966), 42 U. S. C. § 3413(1).

cious" action, but there is little doubt they would have power to do so even in the absence of this statutory provision. Nor do respondents' premises compel their conclusion. Section 1915(d) plays a useful role in the statutory scheme if it informs lawyers that the court's requests to provide legal assistance are *appropriate* requests, hence not to be ignored or disregarded in the mistaken belief that they are improper, like a judge's request to cut short cross-examination so that he can go fishing. Section 1915(d) may meaningfully be read to legitimize a court's request to represent a poor litigant and therefore to confront a lawyer with an important ethical decision; one need not interpret it to authorize the imposition of sanctions should a lawyer decide not to serve in order to give purpose to the provision.[8]

### III

Mallard's petition to this Court followed the Court of Appeals' denial of his application for a writ of mandamus. "The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche* v. *Evaporated Milk Assn.*, 319 U. S. 21, 26 (1943). See also *Will* v. *Calvert Fire Ins. Co.*, 437 U. S. 655, 661 (1978); *Kerr* v. *United States District Court for Northern District of California*, 426 U. S. 394, 402 (1976); *Will* v. *United States*, 389 U. S. 90, 95 (1967). Mallard alleged that

---

[8] Although we do not reach the question whether the federal courts have inherent authority to order attorneys to represent litigants without pay, see Part IV, *infra*, it bears noting that if respondents' argument regarding the function of § 1915(d) were correct, it would seriously undermine respondents' assertion that the federal courts possess inherent power to direct unwilling lawyers to serve. If the federal courts already had the authority to compel representation, then by respondents' reasoning § 1915(d) would have been otiose; respondents would therefore have to conclude, it seems, that the federal courts lacked inherent authority to sanction lawyers for failing to heed the courts' orders to provide legal counsel free of charge.

the District Court did not lawfully exercise its jurisdiction in appointing him and that the Court of Appeals should therefore order the District Court to grant his motion to dismiss his appointment; he did not seek to compel the District Court to exercise some authority it wrongfully declined to use. Although "we have not limited the use of mandamus by an unduly narrow and technical understanding of what constitutes a matter of 'jurisdiction,'" *Kerr, supra,* at 402; see *Will* v. *United States, supra,* at 95, we have required that petitioners demonstrate a "clear abuse of discretion," *Bankers Life & Casualty Co.* v. *Holland,* 346 U. S. 379, 383 (1953), or conduct amounting to "usurpation of [the judicial] power," *De Beers Consolidated Mines, Ltd.* v. *United States,* 325 U. S. 212, 217 (1945), to be entitled to issuance of the writ. To ensure that mandamus remains an extraordinary remedy, petitioners must show that they lack adequate alternative means to obtain the relief they seek, see, *e. g., Kerr, supra,* at 403; *Allied Chemical Corp.* v. *Daiflon, Inc.,* 449 U. S. 33, 35 (1980) *(per curiam),* and carry "the burden of showing that [their] right to issuance of the writ is 'clear and indisputable,'" *Bankers Life, supra,* at 384, quoting *United States* v. *Duell,* 172 U. S. 576, 582 (1899).

Mallard met this demanding standard. In resting its decision solely on § 1915(d)—the only ground for decision properly before us—the District Court plainly acted beyond its "jurisdiction" as our decisions have interpreted that term, for, as we decide today, § 1915(d) does not authorize coercive appointments of counsel. In addition, Mallard had no alternative remedy available to him. And the principal reasons for our reluctance to condone use of the writ—the undesirability of making a district court judge a litigant and the inefficiency of piecemeal appellate litigation, see, *e. g., Kerr, supra,* at 402–403; *Allied Chemical Corp., supra,* at 35—are not present here. The District Court Judge was never made a party to this action, nor did Mallard's petition attempt to sever one element of the merits litigation from the rest.

Thus, Mallard discharged his burden of proving that he was entitled to a writ of mandamus, and the Court of Appeals erred when it denied his application.

## IV

We emphasize that our decision today is limited to interpreting § 1915(d). We do not mean to question, let alone denigrate, lawyers' ethical obligation to assist those who are too poor to afford counsel, or to suggest that requests made pursuant to § 1915(d) may be lightly declined because they give rise to no ethical claim. On the contrary, in a time when the need for legal services among the poor is growing and public funding for such services has not kept pace, lawyers' ethical obligation to volunteer their time and skills *pro bono publico* is manifest. Nor do we express an opinion on the question whether the federal courts possess inherent authority to require lawyers to serve. Although respondents and their *amici* urge us to affirm the Court of Appeals' judgment on the ground that the federal courts do have such authority, the District Court did not invoke its inherent power in its opinion below, and the Court of Appeals did not offer this ground for denying Mallard's application for a writ of mandamus. We therefore leave that issue for another day. We hold only that § 1915(d) does not authorize the federal courts to make coercive appointments of counsel. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE KENNEDY, concurring.

Our decision today speaks to the interpretation of a statute, to the requirements of the law, and not to the professional responsibility of the lawyer. Lawyers, like all those who practice a profession, have obligations to their calling which exceed their obligations to the State. Lawyers also have obligations by virtue of their special status as officers of

the court. Accepting a court's request to represent the indigent is one of those traditional obligations. Our judgment here does not suggest otherwise. To the contrary, it is precisely because our duties go beyond what the law demands that ours remains a noble profession.

I join in full the opinion of the Court.

JUSTICE STEVENS, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE O'CONNOR join, dissenting.

The relationship between a court and the members of its bar is not defined by statute alone. The duties of the practitioner are an amalgam of tradition, respect for the profession, the inherent power of the judiciary, and the commands that are set forth in canons of ethics, rules of court, and legislative enactments. This case involves much more than the parsing of the plain meaning of the word "request" as used in 28 U. S. C. § 1915(d). This case also does not concern the sufficiency of the lawyer's reasons for declining an appointment[1] or the sanctions that may be imposed on an attorney who refuses to serve without compensation. There are, of course, many situations in which a lawyer may properly decline such representation. He or she may have a conflict of interest, may be engaged in another trial, may already have accepted more than a fair share of the uncompensated burdens that fall upon the profession, or may not have the qualifications for a particular assignment. As this case comes to us, however, the question is whether a lawyer may seek relief by way of mandamus from the court's request simply because he would rather do something else with his time. For me, the answer is quite plain.

A few weeks ago we held that the Virgin Islands Bar could not exclude nonresidents from its membership. See *Bar-*

---

[1] The petitioner tried to persuade the Magistrate that he had valid reasons for not wanting to represent convicted felons in litigation against their prison guards, but those reasons were found insufficient by the District Court, see App. to Pet. for Cert. 2a–3a, and this Court does not question the accuracy of that finding.

*nard* v. *Thorstenn*, 489 U. S. 546 (1989). In that case, we expressly recognized the legitimacy of the bar's interest in requiring its entire membership to share in the burdens of providing representation to indigent defendants in criminal cases.[2] *Id.*, at 557–558. That recognition reflects the fact that a court's power to require a lawyer to render assistance to the indigent is firmly rooted in the authority to define the terms and conditions upon which members are admitted to the bar, *Frazier* v. *Heebe*, 482 U. S. 641 (1987); *United States* v. *Hvass*, 355 U. S. 570 (1958),[3] and to exercise "those pow-

---

[2] We stated:

"The final reason offered by petitioners for Rule 56(b)'s residency requirements is somewhat more substantial, though ultimately unavailing. Under District Court Rule 16, each active member of the Virgin Island Bar must remain available to accept appointments to appear on behalf of indigent criminal defendants. According to the affidavit of the President of the Virgin Islands Bar Association, each member can expect to receive appointments about four times per year. Once appointed, it is the duty of the lawyer 'to communicate with the defendant at his place of incarceration as promptly as possible and not later than five days from the date of the clerk's mailing of the order of appointment.' Although the statute does not specifically so provide, the District Court interprets Rule 16 to require that only the appointed attorney may appear on behalf of the criminal defendant. The District Court found that, in light of this individual appearance requirement and the strict time constraints imposed by the Speedy Trial Act, 18 U. S. C. §§ 3161–3174, it would be virtually impossible for this system of appointed counsel to work with nonresident attorneys.

"As respondents point out, if handling indigent criminal cases is a requirement of admission to the Bar, a nonresident knows that he must either appear himself or arrange with a resident lawyer to handle the case when he is unavailable. If the nonresident fails to make all arrangements necessary to protect the rights of the defendant, the District Court may take appropriate action. This possibility does not, however, justify a blanket exclusion of nonresidents." *Barnard* v. *Thorstenn*, 489 U. S. 546, 557–558 (1989) (citations omitted).

[3] See, *e. g.*, *Supreme Court of New Hampshire* v. *Piper*, 470 U. S. 274, 287 (1985) ("Furthermore, a nonresident bar member, like the resident member, could be required to represent indigents and perhaps to participate in formal legal-aid work").

ers necessary to protect the functioning of its own processes." *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787, 821 (1987) (SCALIA, J., concurring in judgment). Cf. *Sparks* v. *Parker*, 368 So. 2d 528 (Ala.) (rejecting constitutional challenges to compelled representation of indigent defendants), appeal dism'd, 444 U. S. 803 (1979). The lawyer's duty to provide professional assistance to the poor is part of the ancient traditions of the bar long recognized by this Court and the courts of the several States.[4] As Justice Field, then sitting on the California Supreme Court, declared more than a century ago:

> "[I]t is part of the general duty of counsel to render their professional services to persons accused of crime, who are destitute of means, upon the appointment of the Court, when not inconsistent with their obligations to others; and for compensation, they must trust to the possible future ability of the parties. Counsel are not considered at liberty to reject, under circumstances of this

---

[4] Justice Cardozo stated for the New York Court of Appeals:

"'Membership in the bar is a privilege burdened with conditions.' The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice. His co-operation with the court was due whenever justice would be imperilled if co-operation was withheld. He might be assigned as counsel for the needy, in causes criminal or civil, serving without pay." *People ex rel. Karlin* v. *Culkin*, 248 N. Y. 465, 470–471, 162 N. E. 487, 489 (1928) (citation omitted).

Cf. E. Brown, Lawyers and the Promotion of Justice 253–254 (1938) ("Because the lawyer is bound by his professional oath to render gratuitous service to poor persons, it has long been customary for the court to assign counsel to those who cannot furnish their own attorney"); H. Drinker, Legal Ethics 62–63 (1953); R. Smith, Justice and the Poor 100 (1967) ("In addition to the inherent power of courts to assign attorneys, on the general theory that they are agents of the court and ministers of justice, there are statutes in many jurisdictions expressly conferring this authority on the judges, to be used in their discretion").

character, the cause of the defenseless, because no provision for their compensation is made by law." *Rowe* v. *Yuba County*, 17 Cal. 61, 63 (1860).

Or, as Justice Sutherland declared for the Court more recently: "Attorneys are officers of the court, and are bound to render service when required by such an appointment." *Powell* v. *Alabama*, 287 U. S. 45, 73 (1932).

Section 1915(d) embodies this authority to order counsel to represent indigent litigants even if it does not exhaust it. The statute was passed to give federal courts the same authority to allow *in forma pauperis* actions that the courts in the most progressive States exercised. In 1892, state courts had statutory authority to order lawyers to render assistance to indigent civil litigants in a dozen States, *ante*, at 304, and common-law power to appoint counsel in at least another 10 States.[5] Congress intended to "open the United States

---

[5] See *Rowe* v. *Yuba County*, 17 Cal. 61, 63 (1860); *Lamont* v. *Solano County*, 49 Cal. 158 (1874); *Elam* v. *Johnson*, 48 Ga. 348 (1873); *Hall* v. *Washington County*, 2 Greene 473, 476 (Iowa 1850); *Case* v. *Board of County Comm'rs of Shawnee County*, 4 Kan. 511 (1868); *State* v. *Simmons*, 43 La. Ann. 991, 10 So. 382 (1891); *Bacon* v. *Wayne County*, 1 Mich. 461 (1850); *Dismukes* v. *Board of Supervisors of Noxubee County*, 58 Miss. 612 (1881); *Johnston* v. *Lewis and Clarke County*, 2 Mont. 159 (1874); *House* v. *Whitis*, 64 Tenn. 690 (1875); *Dane County* v. *Smith*, 13 Wis. 585, 587 (1861). See also *Heckman* v. *Mackey*, 32 F. 574 (CC SDNY 1887) (noting that "[t]he practice of allowing paupers to have original writs and subpoenas *gratis*, and to have counsel and attorney assigned them without fee, and to be excused from paying costs when plaintiffs, dates back to the reign of Henry VII"). In his treatise on Constitutional Limitations written in 1868, Professor Cooley wrote:

"[T]he humanity of the law has provided that, if the prisoner is unable to employ counsel, the court may designate some one to defend him who shall be paid by the government; but when no such provision is made, it is a duty which counsel so designated owes to his profession, to the court engaged in the trial, and to the cause of humanity and justice, not to withhold his assistance nor spare his best exertions, in the defence of one who has the double misfortune to be stricken by poverty and accused of crime. No one is at liberty to decline such an appointment, and few, it is to be hoped, would

courts" to impoverished litigants and "to keep pace" with the laws of these "[m]any humane and enlightened States." H. R. Rep. No. 1079, 52d Cong., 1st Sess., 1–2 (1892). Congress also intended to ensure that the rights of litigants suing diverse parties in the most liberal of these States would not be defeated by the defendant's removal of the suit to federal court. *Id.*, at 1. To be faithful to the congressional design of ensuring the poor litigant equal justice whether the suit is prosecuted in federal or state court, the statute should be construed to require counsel to serve, absent good reason, when requested to do so by the court. The Court's niggardly construction to the contrary departs from the enlightened laws that Congress intended to track and defeats Congress' beneficent purpose.[6]

I attach no particular significance to the difference, if any, between the ordinary meaning of the word "request" used in § 1915(d) and "assign" and "appoint" used in the various state statutes. See *ante*, at 302–303. The federal statute was introduced in the House and the Senate as an Act empowering

---

be disposed to do so." T. Cooley, Constitutional Limitations 334 (2d ed. 1871) (footnote omitted).

In a footnote, Cooley added:

"[A] court has the right to require the service whether compensation is to be made or not; and that counsel who should decline to perform it, for no other reason than that the law does not provide pecuniary compensation, is unworthy to hold his responsible office in the administration of justice." *Id.*, at 334, n. 1.

[6] The Court's reliance on a recent law review article that casts doubt on the power of state courts to sanction attorneys who refused to represent indigents largely misses the point. In its present posture, arising on petitioner's request for a writ of mandamus, the question in this case involves a court's power to order an attorney to represent an indigent party, not its power to sanction an attorney who fails to obey that order. Justices Cardozo, Field, and Sutherland all recognized that a court has such power and, at the time § 1915(d) was enacted, the state courts routinely appointed counsel who were obliged to serve. It is that understanding, against which Congress legislated, rather than any "recent scholarship," *ante*, at 304, n. 4, that should guide our construction of this statute.

courts to "assign" counsel for poor persons, 23 Cong. Rec. 5199, 6264 (1892), and uses the terms "assign" and "request" interchangeably. Significantly, it is entitled "An Act providing when plaintiff may sue as a poor person and when counsel shall be assigned by the court." Ch. 209, 27 Stat. 252. Every contemporary decision uses the word "assign" to describe the judge's authority to secure counsel for parties under § 1915(d). See *Boyle* v. *Great Northern R. Co.*, 63 F. 539 (CC Wash. 1894); *Whelan* v. *Manhattan R. Co.*, 86 F. 219, 220–221 (CC SDNY 1898); *Brinkley* v. *Louisville & N. R. Co.*, 95 F. 345, 353 (CC WD Tenn. 1899); *Phillips* v. *Louisville & N. R. Co.*, 153 F. 795 (CC ND Ala. 1907), aff'd, 164 F. 1022 (CA5 1908); *United States ex rel. Randolph* v. *Ross*, 298 F. 64 (CA6 1924). It is evident that the drafters of this statute understood these terms to impose similar obligations and simply assumed that members of our profession would perform their assigned tasks when requested to do so by the court.

The notion that this petitioner had an absolute right to have his "motion to withdraw" granted by the District Court—and therefore that a writ of mandamus may properly issue—is completely unacceptable to me. An attorney who has entered an appearance in a case may not withdraw without leave of court because the court's interest in making sure that a litigant is adequately represented and that the orderly prosecution of the lawsuit is not disrupted is paramount to a lawyer's personal interest in terminating a relationship with a client. See, *e. g., Ohntrup* v. *Firearms Center, Inc.*, 802 F. 2d 676 (CA3 1986); *Mekdeci ex rel. Mekdeci* v. *Merrell National Laboratories*, 711 F. 2d 1510, 1521–1522 (CA11 1983). In this unique case the petitioner apparently filed his motion to withdraw without first entering an appearance—thus, the motion might more appropriately have been captioned as a "petition to be excused from performing a nonexistent duty to enter an appearance in a pending case." Indeed, the very fact that the petitioner considered it appropriate to ask the

Magistrate to allow him to "withdraw" is evidence of his recognition of some duty to accept the appointment unless there was a valid excuse for declining it.

The program adopted by the District Court for the Southern District of Iowa to provide representation for indigent litigants was in operation when petitioner became a member of that court's bar. In my opinion his admission to practice implicitly included an obligation to participate in that program.[7] When a court has established a fair and detailed procedure for the assignment of counsel to indigent litigants, a formal request to a lawyer by the court pursuant to that procedure is tantamount to a command.

In context, I would therefore construe the word "request" in § 1915(d) as meaning "respectfully command." If that is not what Congress intended, the statute is virtually meaningless. There is no substance to the Court's speculation that Congress enacted this provision because of a concern that a court's requests to represent a poor litigant might otherwise be "disregarded in the mistaken belief that they are improper." *Ante*, at 308. There is no anecdotal or historical evidence to support this highly improbable speculation.[8]

---

[7] "[R]epresentation of indigents under court order, without a fee, is a condition under which lawyers are licensed to practice as officers of the court, and . . . the obligation of the legal profession to serve without compensation has been modified only by statute. An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order." *United States* v. *Dillon*, 346 F. 2d 633, 635 (CA9 1965), cert. denied, 382 U. S. 978 (1966), cited with approval in *Hurtado* v. *United States*, 410 U. S. 578, 589 (1973).

[8] Nor is there substance to the Court's surmise that the passage of the Criminal Justice Act of 1964, 18 U. S. C. § 3006A, and related statutes, indicates that Congress did not intend in 1892 to give the courts authority to require attorneys to render assistance to the indigent. See *ante*, at 305–306. The Criminal Justice Act was enacted precisely because of defects in the system under which an attorney was not "appointed to represent the needy defendant until he is arraigned" and the case was "then committed to

In my opinion Congress gave its endorsement to these judicial "requests," assuming that it would be "unthinkable"[9] for a lawyer to decline without an adequate reason.

I respectfully dissent.

---

an attorney who [would] receive no fee for his services or reimbursement for his expenses." S. Rep. No. 346, 88th Cong., 1st Sess., 12 (1963) (letter of Attorney General Robert F. Kennedy to President Kennedy).

[9] See Tr. of Oral Arg. 8. Justice Blackmar of the Missouri Supreme Court expressed precisely my sentiments in dissent from a decision denying the courts of that State the power to compel attorneys to represent indigents in civil cases:

"I have often served in court appointments, and I am sure that my brethren have also. When a judge said, 'help me out,' I really felt that I had no choice. Perhaps I had in mind the old army maxim that the commanding officer's desire is the subaltern's command. Perhaps I thought that the court could use its coercive power. I found, however, that judges were sensitive when good reasons for declining appointments were advanced, and were willing to explore alternatives. By issuing our absolute writ, we strip the respondent [the trial judge] of her bargaining power." *State ex rel. Scott* v. *Roper*, 688 S. W. 2d 757, 773 (1985).