**TAX AND ACCOUNTING SOFTWARE CORPORATION, Tim E. Kloehr and Sheryl Kloehr, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 98–CV–363E.**

United States District Court, N.D. Oklahoma.

July 31, 2000.

Rebecca McCarthy Fowler, Doerner Saunders Daniel & Anderson, Tulsa, OK, for Plaintiffs.

Rachel D. Cramer, U.S. Dept. of Justice, Tax Division, Washington, DC, for Defendant.

## ORDER

ELLISON, Senior District Judge.

Now before the Court are the cross motions for summary judgment of the Plaintiffs, Tax and Accounting Software Corporation, Tim Kloehr and Sheryl Kloehr (collectively referred to as "TAASC") and the Defendant, United States of America (referred to herein as the "IRS").

TAASC creates and sells software programs designed to be used by tax and accounting professionals. This dispute involves tax credits that were claimed by TAASC for tax years 1993 and 1994 under the "research credit" provisions of § 41 of the Internal Revenue Code for expenses incurred in the creation of such software.

Summary judgment pursuant to Fed. R.Civ.P. 56 is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Windon Third Oil & Gas v. FDIC*, 805 F.2d 342 (10th Cir.1986). In *Celotex*, the court stated:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. 317, 106 S.Ct. 2548 (1986). To survive a motion for summary judgment, nonmovant "must establish that there is a genuine issue of material facts ..." Nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Zenith*, 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence and inferences therefrom must be viewed in a light most favorable to the nonmoving party. *Conaway v. Smith*, 853 F.2d 789, 792 n. 4 (10th Cir.1988). Unless the Defendants can demonstrate their entitlement beyond a reasonable doubt, summary judgment must be denied. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980).

The Tenth Circuit Court of Appeals decision in *Committee for the First Amendment v. Campbell*, 962 F.2d 1517 (10th Cir.1992), concerning summary judgment states:

> Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." ... Factual disputes about immaterial matters are irrelevant to a summary judgment determination ... We view the evidence in a light most favorable to the nonmovant; however, it is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative."
>
> \*       \*       \*       \*       \*       \*
>
> A movant is not required to provide evidence negating an opponent's claim ... [r]ather, the burden is on the nonmovant, who "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." ... After the nonmovant has

had a full opportunity to conduct discovery, this burden falls on the nonmovant even though the evidence probably is in possession of the movant. (Citations omitted.)

*Id.* at 1521.

## Facts

The undisputed facts are as follows [1]: TAASC is an Oklahoma corporation and is taxed as a Subchapter S corporation. TAASC develops and markets computer software programs. Tim E. Kloehr is the sole shareholder of TAASC. In 1993, all income of TAASC was reported on Tim Kloehr's individual tax return and in 1994, all income of TAASC was reported on the joint return filed by Tim Kloehr and his wife, Sheryl Kloehr.

During tax years 1993 and 1994, TAASC was in the process of developing four software products, i.e., 1.) EasyACCT an accounting program for use by accounting and business professionals; 2.) EasyMICR, a method of printing bank codes and other information on checks; 3.) the Professional Tax System, a comprehensive system for preparing federal and state returns for a variety of reporting entities for use by accounting professionals; and 4.) EasyTEL, a call processing system for use in small to mid-size professional offices.

In the development of EasyACCT, TAASC's design goal was to create a software program which could satisfy the varying needs of a business as well as a professional accounting firm. The EasyACCT software fully integrated a variety of accounting functions and features for both recording transactions and accumulating historic data into one system and allowed data to be transferred between accounting function modules and a tax

preparation system. When EasyACCT was introduced, there was no other software system on the market which integrated these abilities. Business and professional accounting firms, therefore, typically were required to use a number of separate programs to perform the variety of tasks required. Critical to TAASC's goal was the ability to design the system within the memory constraints of computer hardware available at the time and maintain the compatibility functions and clean movement between screens and options provided by its separate, less complex programs. TAASC developed a single Invoices/Receivables module to be integrated with the existing system. TAASC intended to design a single transaction feature from which all activities could be recorded, edited and posted. Invoices/Receivables programs on the market at that time featured separate modules for order taking and accounts receivables. The single transaction module would also allow the user to record items in inventory to set up inventory items, another feature unique at that time. These features were included in the release of EasyACCT in 1995.

During 1993, TAASC conducted research for the design of EasyMICR, a program designed to print magnetic ink character banking transit codes on blank check stock. The program was intended for users of Quicken and Quickbooks and would allow them to print checks on blank stock relieving them of the necessity of buying preprinted check stocks from a supplier. TAASC was required to design two programs, one in the DOS format, and one in the Windows format. The research conducted by TAASC lead to significant developments. The DOS program used very little memory, and the Windows' pro-

---

**1.** The IRS does not dispute the chronology of facts set out in TAASC's affidavits. The IRS criticizes certain characterizations and conclusions drawn by TAASC as to whether a program was "large and complex" or whether certain actions amount to "research" or "experiments" or "discoveries". As pointed out by the IRS, terms such as "large and complex" are relative terms and it is the opinion of the IRS' expert that the programs

in question are not "large and complex". This Court does not believe that the determination of "large and complex" is determinative of the outcome of this case. As to a description of the relevant activities of TAASC, the Court prefers to use the terms "develop" or "create" (in the vernacular). Whether such activities rise to the level of the terms of art used in § 41 are ultimately conclusions of law to be determined by the Court.

gram would run in standard, protected or enhanced modes. Although a technological success, the EasyMICR system was a commercial failure as a stand alone product. It has since been integrated into EasyACCT.

The Professional Tax System is a comprehensive tax preparation software program which prepares returns for a variety of entities such as individuals, corporations, partnerships, trusts and others. Prior to TAASC's development of this system, accountants had to use separate programs to prepare returns for each type of entity. The Professional Tax System combined several programs into a single system. Through that combination, TAASC was able to create many new features to this product that were unavailable in competitive products. As with the EasyACCT accounting system, the integration of these previously independent programs into a single system and the addition of new features resulted in a relatively large and complex program. A critical element of TAASC's design goal, therefore, was to produce a system that minimized the memory space required on a user's computer, and operated at speeds higher than its competitors.

During 1993 and 1994, TAASC also worked on the development of EasyTEL, an automated multi-tasking call processing system. This product, which combines computer hardware and software, is used in connection with a PBX system or directly with the telephone company's public switched network to answer and transfer telephone calls, take voice mail messages, supply Audiotex information services, receive and convert fax messages to email, and act as a fax distribution system. TAASC's goal in the development of EasyTEL was to produce a product which could perform a large number of tasks simultaneously but have a lower cost per unit than other automated call processing systems.

TAASC hoped to achieve this goal by using lower cost hardware and requiring a minimum of administrative maintenance. The use of lower cost hardware, however, required that TAASC overcome certain software design problems. Prior to this design, there were no known products on the market which integrated all of the functions to be placed within the EasyTEL system. The systems then available provided only some of the EasyTEL functions and used very expensive computer hardware and multitasking operating systems. These other systems were very difficult to set up and maintain. They required the use of programming commands and languages to successfully install such a system and additional commands to change or maintain the system. TAASC's goal was to design a system that used readily available low cost parts (such as those used in existing PC computers) and could be installed or maintained by non-technical individuals.[2]

The EasyACCT system and Professional Tax System designed by TAASC enjoyed commercial success, having 6959 customers in 1994, 9887 customers in 1995 and 12,146 customers in 1996. In 1993, TAASC incurred a total of $1,838,756 in research development expenses for the above described software products. Likewise, the research and development expenses were $2,444,938 in 1994. The IRS allowed these expenses to be used as deductions under § 174, but disallowed the same expenses as a credit under § 41. TAASC has paid all taxes owed for 1993 and 1994 and has submitted refund claims in the amount of $123,764 for 1993 and $192,510 for 1994.

## ANALYSIS

The Court's task herein is to determine whether any or all of the pertinent software development activities of TAASC constitute "qualified research" for pur-

2. The affidavits submitted to the Court under an Agreed Confidentiality Order contain descriptions of numerous experiments and tests that were conducted in an effort to achieve the goals set by TAASC on each of the software systems. Because of the agreed proprietary and confidential nature of the descriptions in the affidavits, the Court will not attempt to describe those acts in this Order.

poses of the tax credit provided by § 41 of the Internal Revenue Code (26 U.S.C. § 41(d)(1)). The tax code sets out several tests that must be met for "qualified research". First, the research must have qualified as a business deduction under § 174. See *id.* § 41(d)(1)(A). Second, the research must be undertaken to "discover information which is technological in nature." *Id.* § 41(d)(1)(B)(i). Third, the taxpayer must intend to use the information to develop a new or improved business component. *Id.* § 41(d)(1)(B)(ii). Finally, the taxpayer must pursue a "process of experimentation" during substantially all of the research. *Id.* § 41(d)(1)(C).[3]

There have been very few reported cases construing the § 41 credit as it applies to the creation of computer software programs. Two cases have analyzed the tests of § 41 as they pertain to software that has been created for the "internal use" of the taxpayer. *Norwest Corporation and Subsidiaries v. Commissioner of Internal Revenue,* 110 T.C. 454, 1998 WL 341634, (1998); *United Stationers, Inc. v. United States,* 982 F.Supp. 1279 (N.D.Ill. 1997), *affirmed* 163 F.3d 440 (7th Cir. 1998). There have been no reported cases applying § 41 to software which has been created to be licensed commercially.

Section 41 is construed much more strictly for "internal use" software than it is for "commercial" software and requires that seven tests must be met for "internal use" software rather than the four stated above. *Norwest,* supra, at 456. While the courts' analyses contained in *Norwest* and *United Stationers* were very helpful to this Court on the requirements of § 41, the Court does not believe that those cases fully comply with the Congressional intent of § 41 and are not applicable to cases involving software developed for the commercial market.

In the case of *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the United States Supreme Court established a two-step method for judicial review of an agency's interpretation of a statute that it administers. The *Chevron* Court relied on the principle that policy choices are for the political branches of government, and Congress is the supreme branch for making such choices. Under *Chevron,* however, courts retain their traditional role to interpret statutes.

Reviewing courts must first use "traditional tools of statutory construction" to determine whether "Congress has directly spoken to the precise question at issue." 467 U.S. at 843, 104 S.Ct. at 2782. If Congress has clearly expressed its intent in the plain language of the statute, the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If the language of the statute is determined to be either ambiguous or silent on the particular issue, the reviewing court is free to proceed to the second inquiry of *Chevron, i.e.,* whether the agency's interpretation is based on a permissible construction of the statute.[4]

---

**3.** The term "qualified research" means research—

    **(A)** with respect to which expenditures may be treated as expenses under section 174,

    **(B)** which is undertaken for the purpose of discovering information—

    **(i)** which is technological in nature, and

    **(ii)** the application of which is intended to be useful in the development of a new or improved business component of the taxpayer, and

    **(C)** substantially all of the activities of which constitute elements of a process of experimentation for a purpose described in paragraph (3).

**4.** See, e.g., *City of Chicago v. Environmental Defense Fund,* 511 U.S. 328, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994). The Supreme Court stated the threshold inquiry in *Chevron* in terms of whether Congress has unambiguously foreclosed the interpretation offered by an agency. See *MCI Telecommunications Corp. v. American Tel. & Tel. Co.,* 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (concluding that the agency interpretation went "beyond the meaning that the statute can bear"); *Environmental Defense Fund,* 511 U.S. at 334, 114 S.Ct. at 1594, 128 L.Ed.2d at 312 (same for interpretation that went "beyond the scope of whatever ambiguity" existed); and *John Hancock Mutual Life Ins. Co. v. Harris*

## A. The "Section 174" and the "Business Component" Tests

The § 174 test requires that the research expenditures qualify as expenses under § 174 of the Internal Revenue Code. Section 174 generally allows as a current deduction, research and experimental expenditures which are paid or incurred by the taxpayer in connection with the operation of a trade or business. In the present case, the parties agree that TAASC has met this test.

In addition, the "business component test" requires that the research be undertaken for the purpose of discovering information the application of which is intended to be useful in the development of a new or improved business component of the taxpayer. TAASC has submitted evidence that the activities in question "relate to a new or improved function, performance, reliability or quality of a product". H.Conf.Rept. 99–841 (Vol.II), 1986–3. The IRS does not challenge TAASC's assertion or evidence that it has met this test.

## B. The "Technology" or "Discovery" Test

■ Section 41 requires that the research activity in question be for the purpose of "discovering information that is technological in nature". The IRS and the Courts in *Norwest* and *United Stationers* have erroneously tried to divide this requirement into two tests with the first being whether the taxpayer's actions can be considered a "discovery" in the scientific sense (the "Discovery Test"). However, that construction of the statutory language would be a strained and improper reading without any support in the legisla-

tive history to back it up. The emphasis should be on whether the information qualifies as being "technological in nature" (the Technology Test), not whether the work could be considered a revolutionary discovery in the scientific sense. The statutory language was intended to differentiate between information that is technologically based from that which is non-technologically based. As stated by Congress in 1986:

> The determination of whether research is undertaken for the purpose of discovering information that is technological in nature depends on whether the process of experimentation utilized in the research *fundamentally relies on principles of the physical or biological sciences, engineering, or computer science* —in which the information is deemed technological in nature—or on other principles, such as economics—in which case the information is not to be treated as technological in nature. (Emphasis added)

H.R.Conf.Rep. No. 99–841, Vol II at 71 (1986).

Although the word "discovery" is susceptible of conveying several meanings, "discover", "determine", "ascertain", "detect" "unearth" and "learn" are synonyms and are treated as such in common usage.[5] Common usage provides acceptable grounds on which to divide statutory terms into primary, secondary, and other meanings.[6] The Court does not agree with the IRS's contention that this Court should ignore the common usage of certain words in favor of a "scientific" meaning.[7]

The IRS argues that in order for research to pass the "Discovery" test, it re-

---

*Trust and Savings Bank,* 510 U.S. 86, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (same for interpretation that "exceeded the scope of available ambiguity").

**5.** See Webster's Third New International Dictionary, p. 647

**6.** See, e.g., *Mallard v. United States Dist. Court,* 490 U.S. 296, 301, 109 S.Ct. 1814, 1818, 104 L.Ed.2d 318 (1989) *Ardestani v.*

*I.N.S.,* 502 U.S. 129, 112 S.Ct. 515, 519, 116 L.Ed.2d 496, 504 (1991), *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 153, 110 S.Ct. 471, 476, 107 L.Ed.2d 462 (1989).

**7.** The IRS also contends that some of the terms used by the Plaintiff's in their briefs are used in their vernacular sense when, in fact, the court should follow the "scientific" definition to determine whether the Plaintiffs' actions meet the required burden.

quires "newness and expansion of existing knowledge". Furthermore, the regulations created by the IRS require "obtaining knowledge that exceeds, expands, or refines the common knowledge of skilled professionals in the particular field of technology or science". Proposed Reg.Sec. 1.41–4(a)(3). However, there is no support for this position in the statute or the legislative history. The purpose of the "technology" requirement of § 41 is to eliminate the "soft sciences" from contention for the credit, not to focus on the word "discovery".

The Court is further persuaded by the fact that subsequent to the decision in *Norwest* and *United Stationers,* Congress stated:

> ... However, eligibility for the *credit does not require that the research be successful*—i.e., the research need not achieve its desired result. Moreover, evolutionary research activities intended to improve functionality, performance, reliability, or quality are eligible for the credit, as are research activities intended to achieve a result that has already been achieved by other persons but is not yet within the common knowledge (e.g., freely available to the general public) of the field ... (Emphasis Added) H.R.Conf.Rep. 105–825, at 2 (1998)

While Congressional comments which are post-enactment do not have the weight of contemporary legislative history, the Court would be remiss in its duties if it were to ignore evidence of Congressional intent.[8] In the statement above, Congress states that the research does not have to be successful and it need not achieve its "desired result". While it is possible to "expand the existing knowledge" with unsuccessful research, this Court believes that the criteria championed by the IRS and the regulations cited above are some-

what inconsistent with Congress's statement that the research does not need to achieve its intended result.[9]

Similarly, Congress has voiced disagreement with the IRS's assertion that the research must "obtain knowledge that exceeds, expands or refines the common knowledge of skilled professionals in the particular field of technology or science". When recently extending the life of § 41, Congress made it clear that the IRS's regulations do not follow the intent of Congress.

In H.R.Conf.Rep. No. 478, 106th Cong., 1st Sess.1999, the Senate and House Conferees state:

> The conferees wish to reaffirm that qualified research is research undertaken for the purpose of discovering new information which is technological in nature. For purposes of applying this definition, *new information is information that is new to the taxpayer,* is not freely available to the general public, and otherwise satisfies the requirements of section 41. Employing existing technologies in a particular field or relying on existing principles of engineering or science is qualified research, if such activities are otherwise taken for purposes of discovering information to satisfy the other requirements of section 41. (Emphasis added)

Some of the documentation submitted to the Court by the IRS shows that TAASC and the software vendors who are their competition, were all trying to develop "suites" of software applications or applications that were integrated with each other[10]. The IRS's documentation also shows that this was something that had previously not been available to the public. It is not required that TAASC be the first to learn how to integrate the respective ac-

---

**8.** *Michigan United Conservation Clubs v. Lujan, et al.,* 949 F.2d 202 (6th Cir.1991)

**9.** The phrase used is "evolutionary research", not "revolutionary research". This suggests to the Court a pattern of research that is unfolding in a series of events rather than

something that is a radical change from the norm.

**10.** See Appendix C to the United State's Opposition to Plaintiff's Motion for Summary Judgment.

counting functions, nor is it required that the technologies used be nonexistent at the time. TAASC was using existing technologies to develop integrated accounting and tax software that operated within certain RAM requirements. The evidence shows that this final product was a new and more efficient combination of software that was not available to the public and that the competition was stiff to develop and bring such a product to the market. The Court finds that TAASC has performed activities which have ascertained or determined information that was new to TAASC, and was not generally available to the public, where the process of experimentation utilized in the research fundamentally relies on principles of computer science, and is, therefore, technological in nature.

### C. The Process of Experimentation Test

The process of experimentation test requires that substantially all of the activities which constitute elements of a process of experimentation relate to a new or improved function, performance, reliability, or quality. The process of experimentation test is explained by Congress as follows:

> The term process of experimentation means a process involving the *evaluation of more than one alternative* designed to achieve a result where the means of achieving that result is uncertain at the outset. This may involve developing one or more hypotheses, testing and analyzing those hypotheses (through, *for example,* modeling or simulation), and refining or discarding the hypotheses as part of a sequential design process to develop the overall component. Thus, for example, costs of developing a new or improved business component are not eligible for the credit if the method of reaching the desired objective (the new or improved product characteristics) is readily discernible and applicable as of the beginning of the research activities, so that true experimentation in the scientific or laboratory sense would not have to be undertaken to develop, test, and choose among the

viable alternatives. On the other hand, costs of experiments undertaken by chemists or physicians in developing and testing a new drug are eligible for the credit because the researchers are engaged in scientific experimentation. Similarly, engineers who design a new computer system, or who design improved or new integrated circuits for use in computer or other electronic products, are engaged in qualified research *because the design of those items is uncertain at the outset and can only be determined through a process of experimentation relating to specific design hypotheses and decisions as described above.* (Emphasis Added)

H.R.Conf.Rep. 99–841 at Section C, Page 4

Again in 1998, Congress attempted to give additional guidance on its intent as to the requirement of a "process of experimentation", when it stated:

> Activities constitute a process of experimentation ... if they involve evaluation of more that one alternative to achieve a result where the means of achieving the result are uncertain at the outset, *even if the taxpayer knows at the outset that it may be technically possible to achieve the result.* Thus, even though a researcher may know of a particular method of achieving an outcome, the use of the process of experimentation to effect a new or better method of achieving that outcome may be eligible for the credit ... outcome, the use of the process of experimentation to effect a new or better method of achieving that outcome may be eligible for the credit ... (Emphasis Added)

H.R.Conf.Rep. 105–825, at 3 (1998)

■ The credit was established as an incentive to encourage taxpayers to incur the cost of research in developing new products and stimulating the economy. The IRS is proposing standards that would be suitable for academic research where the research is going to be published and replicated under the peer review process.

However, the IRS is completely missing the fact that Congress intended to encourage commercial research, not academic research. In the commercial environment, time and secrecy are of the essence if the product is going to succeed. The highly structured definition of research which is proffered by the IRS in its regulations makes it virtually impossible for commercial research to qualify for the § 41 credit, which was clearly not the intention of Congress. TAASC has proven that it followed a "process of experimentation" where it evaluated more than one alternative to achieve its intended result, where the process of achieving that result was uncertain at the outset.[11] TAASC had a goal of developing certain integrated suites of software applications that were not available to the public in that form, and which operated within certain limitations of available memory and processing power. TAASC knew at the outset that there were many alternative methods of designing the programming of each component and such would need to be tested, redesigned, refined and maybe eliminated in order to reach the final satisfactory product. TAASC followed a "process of experimentation" in order to reach their final product.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the Plaintiff's Motion for Summary Judgment is hereby granted and the Defendant's Motion for Summary Judgment is denied.

---

11. The IRS and its expert argue that "a process of experimentation" cannot include "trial and error". However, this position is inconsistent with Preamble to the IRS's proposed regulations where testing and analysis can be conducted through "modeling, simulation, or a systematic trial and error methodology". 63 FR 66505