**Donald Lee COLBERT, Plaintiff,**

v.

**Greg RICKMON, et al., Defendants.**

**Civ. No. 89–2192.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Aug. 6, 1990.

Donald Lee Colbert, El Reno, Okl., pro se.

Michael R. Rainwater, Skokos, Coleman & Rainwater, Little Rock, Ark., Wyman R. Wade, Jr., Dailey, West, Core, Coffman and Canfield, Ft. Smith, Ark., David H. McCormick, Russellville, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

The factual background of this case is set forth in the previous memorandum opinion filed on June 21, 1990. For the present it is sufficient to state that plaintiff initiated an action under 42 U.S.C. § 1983, alleging that he was incarcerated in the Sebastian County Jail for several months awaiting trial on charges stemming from a "hot check cashing" scam. Plaintiff alleged, *inter alia*, that he was illegally arrested at a motel in Fort Smith, that his motel room was illegally searched, and that he was unlawfully detained without a judicial determination of probable cause.

By order dated June 21, 1990, this court denied the motions for summary judgment filed by Fort Smith police officers Rickman and Harvey, and allowed plaintiff to proceed against these defendants with regard to plaintiff's assertion that he was subjected to an unlawful arrest and search. The court further denied the motion to dismiss filed by prosecuting attorney, Ron Fields, with regard to plaintiff's contention that Fields caused the plaintiff to be unlawfully detained without a judicial determination of probable cause. The remainder of plaintiff's claims were dismissed.

Plaintiff now moves for the appointment of counsel to assist him in the discovery stage of this litigation and at trial. Plaintiff's motion implicates the holding of the United States Supreme Court in *Mallard v. United States District Court*, 490 U.S. 296, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) and raises questions concerning the authority of this court to "appoint" an attorney to assist the plaintiff in the prosecution of this action.

■ In *Mallard*, the Supreme Court held that 28 U.S.C. § 1915(d) does not authorize a federal court to require an unwilling attorney to represent an indigent litigant in a civil case. § 1915(d) provides: "the court may request an attorney to represent any (person claiming *in forma pauperis* status) unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious."

In *Mallard* the Supreme Court decided that Congress' choice of the word, "request" in the statute was intended not to authorize the uncompensated mandatory appointment of unwilling counsel in civil litigation. The court expressly left open the question "whether the federal courts have inherent authority to order attorneys to represent litigants without pay." *See Mallard,* 109 S.Ct. at 1821, n. 8. As to this, the court wrote:

> We emphasize that our decision today is limited to interpreting § 1915(d). We do not mean to question, let alone denigrate, lawyers' ethical obligation to assist those who are too poor to afford counsel, or to suggest that requests made pursuant to § 1915(d) may be lightly declined because they give rise to no ethical claim. On the contrary, in a time when the need for legal services among the poor is growing and public funding for such services has not kept pace, lawyers' ethical obligation to volunteer their time and skills pro bono publico is manifest. Nor do we express an opinion on the question whether the federal courts possess inherent authority to require lawyers to serve.

*Mallard,* 109 S.Ct. at 1822–23.

Thus, there is no statutory authorization for this court to require an unwilling attorney to assist the plaintiff in the prosecution of his civil rights claim. It follows that if this court possesses the power to do so, the authority must derive from those inherent in the judicial function.

■ One argument to which the Supreme Court alluded in *Mallard,* is that if federal courts possess the inherent power to direct unwilling lawyers to serve in civil

litigation without compensation, then § 1915(d) which merely empowers federal courts to "request" such service, would have been otiose.[1] In response to this proposition, the Supreme Court said:

Respondent's major premise, however, is too strong. Statutory provisions may simply codify existing rights or powers. § 1915(d), for example, authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision.

*Mallard*, 109 S.Ct. at 1821.

Nonetheless, this reasoning is tangentially suggestive of the proposition that federal courts do not possess the inherent authority to require an unwilling attorney to undertake the civil representation of indigents without compensation. If Congress believed that federal courts inherently possess, by their very nature, the power to *require* such representation, it does not seem logical that Congress would enact a statute conferring the power to *request* such representation on the federal courts except, perhaps, to expressly "legitimize" such requests. However, it goes without saying that the judiciary does not require approval from the Article 1 branch of government to wield its inherent Article 3 power. This, of course, deductively proves nothing, although it is arguably supportive of the thesis that Congress did not, at the time of enactment, think such judicial power existent. However, what Congress may or may not have believed about the *inherent* authority of the judiciary is certainly not controlling or dispositive.

A case which could have shed some light on this issue, but did not, is *Federal Trade Commission v. Superior Court Trial Lawyers Assn.*, —— U.S. ——, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). In that case, most of the attorney-members of the Washington, D.C. Superior Court Trial Lawyers Association, in an effort to persuade the "powers that be" to increase the compensation under the Criminal Justice Act (CJA) for attorneys who had agreed to accept CJA appointments in criminal cases, collectively refused to accept further appointments. To make a long story short, the FTC "got in on the act" and asserted that the "boycott" was unlawful under the Sherman Act. On review, the Supreme Court held that the Trial Lawyers' conduct was not clearly outside the scope of the Sherman Act nor immunized by the First Amendment. The dissent in the *Trial Lawyers* case urged that because the "governmental bodies ... had the power to terminate the boycott at any time by requiring any or all members of the District Bar ... to represent indigent defendants pro bono," the Trial Lawyers lacked any "market power" which would place such conduct beyond the reach of the Sherman Act. However, the majority opinion held that proof of market power was not required under the circumstances, thereby failing to provide any guidance as to the issue before this court.

The power to appoint an unwilling attorney without compensation has been challenged in principle on three grounds: (1) that to require such service constitutes involuntary servitude under the Thirteenth Amendment; (2) that it constitutes an unlawful taking of property or a taking for a public use which requires just compensation under the Fifth Amendment; and (3) that to subject attorneys as a class to such an obligation constitutes discrimination which would deprive them of the equal protection of the laws under the Fourteenth Amendment. *See, Fisch, Coercive Appointments of Counsel in Civil Cases in Forma Pauperis: An Easy Case Makes Hard Law*, 50 Mo.L.Rev. 527 (1985). It has been written that these arguments have been largely rejected. *See*, for example *United States v. Dillon*, 346 F.2d 633 (9th Cir.1965), *cert. den.* 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966). *See also*, Rosenfeld, *Mandatory Pro Bono: Historical and Constitutional Perspectives*, 2 Cardozo L.Rev. 255 (1981); *Note, Court Appointment of Attorneys in Civil Cases:*

---

**1.** The argument had been advanced in *Mallard* that § 1915(d) must be construed so as to empower a federal court to require the uncompensated assistance of an attorney in civil litigation because federal courts already possessed the inherent power to "request" such assistance.

*The Constitutionality of Uncompensated Legal Assistance,* 81 Colum.L.Rev. 366 (1981).

However, the belief that such power is inherent in the judicial branch of government is far from universal. *See Delisio v. Alaska Superior Court,* 740 P.2d 437 (Alaska 1987) ("requiring an attorney to represent an indigent criminal defendant for only nominal compensation unfairly burdens the attorney" and violates the takings clause of the Alaska constitution); *Stephan v. Smith,* 242 Kan. 336, 747 P.2d 816 (1987) ("The state has an obligation to compensate attorneys appointed to represent indigent defendants accused of crime"). In fact, some commentators question the proposition that a "vast majority" of courts have upheld the constitutionality of mandatory *pro bono. See* Shapiro, *The Enigma of the Lawyer's Duty to Serve,* 55 N.Y.U.L.Rev. 735 (1980).

Historically, Colonial and American statutes authorized courts to provide counsel at the request of indigents in capital cases, an extensive practice inasmuch as almost all felonies were capital crimes. *See* 4 W. Blackstone, Commentaries 94 (1st Ed.1769). This power was later occasionally extended so as to include civil cases for absentee parties and minors. *See Louisiana v. Simpson,* 38 La.Ann. 23 (1886); *House v. Whitis,* 64 Tenn. 690 (1875). The colonial distrust of lawyers, however, led litigants to frequently plead their own causes in the majority of cases. *See* discussion in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

It is true that the belief in the existence of judicial discretion to appoint *pro bono* attorneys for indigent civil rights plaintiff has been widespread, but questioned, in the last three decades. *See Caston v. Sears, Roebuck & Co.,* 556 F.2d 1305 (5th Cir. 1977). The problem has been approached from the "back door" in several cases wherein some courts have exercised what they term the "inherent power" to compel legislative expenditures for "necessary" judicial operations, requiring the compensation of appointed attorneys. *See Knox County Council v. McCormick,* 217 Ind.

493, 29 N.E.2d 405 (1940); *Honore v. Wash. St. Bd. of Prison Terms,* 77 Wash.2d 660, 466 P.2d 485 (1970) (*en banc*). *See also* the *dictum* in *Allison v. Wilson,* 277 F.Supp. 271 (N.D.Cal.1967), wherein the court implied that the inherent power to appoint civil counsel, by implication carries with it the power to commit federal funds to underwrite expenditures.

Most would agree with the concept that such judicial power exists as is necessary to procure buildings, personnel and supplies for the essential functions of the courts. *See Wayne Circuit Judges v. Wayne County,* 386 Mich. 1, 190 N.W.2d 228 (1971) (law clerks and assistants). Others take issue with the concept that the inherent power of the judiciary extends so far as to order another branch of government to provide for the payment of appointed attorneys. *See Sparks v. Parker,* 368 So.2d 528 (Ala.1979).

Courts have found various ways to appoint counsel in criminal cases shifting to the legislatures the burden of developing and funding a system for providing attorneys, and have had few qualms about the constitutional aspects of so doing, because without counsel, or a valid waiver thereof, a criminal proceedings is a nullity in all but the most minor of cases. However, the legislature has never been thought to possess the *duty* to finance an indigent prisoner's civil rights litigation. As is obvious, neither the issue nor the controversy is new.

In Cardin and Rhudy, *Symposium: Expanding Pro Bono Legal Assistance in Civil Cases to Maryland's Poor,* 49 Md.L. Rev. 1 (Winter, 1990), it is noted that the English Magna Carta, signed by King John in 1215 on the plains of Runnymede, contained this provision:

> To no one will we sell, to no one will we refuse or delay, right or justice.

Magna Carta, Art. 40.

Cardin and Rhudy also observed that beginning in the fifteenth century English attorneys were required by statute to assist without compensation persons unable to pay for private counsel (citing 11 Hen. 7,

ch. 12 (1495)), reprinted in Smith, *Justice and the Poor*, 21 (3d Ed.1924).

Brief research, however, reflects that since at least the mid-nineteenth century, attorneys have ubiquitously appeared to raise various constitutional challenges to forced attorney labor. *See Hall v. Washington*, 2 Greene 473 (Iowa, 1850) (taking without compensation). Some arguments were couched in terms of an asserted implied or quasi-contractual relationship between the attorney and the government. *See Whicher v. Cedar County*, 1 Greene 217 (Iowa, 1848). Sometimes resourceful courts adopted a requirement that court-appointed attorneys be compensated under provisions of *state* constitutions. *See Webb v. Baird*, 6 Ind. 13 (1854) (state constitutional provisions stated: "no man's particular services shall be demanded without just compensation."); *Dane County v. Smith*, 13 Wis. 585, 80 Am.Dec. 754 (1861); *Carpenter v. Dane County*, 9 Wis. 274 (1859).

Some scholars opine that most of the early cases rejecting attorneys' claims were based upon the court's asserted lack of inherent power to compel the expenditure of public funds for the purpose of paying attorneys. *See, Nabb v. United States*, 1 Ct.Cl. 173 (1864); *Presby v. Klickitat County*, 5 Wash. 329, 31 P. 876 (1892). An early Arkansas case rested its decision against required compensation for appointed attorneys on the theory that attorneys are not individuals in the community, but are "officers of the court," a respected breed of second-class citizen, exhalted and revered but forever subject to the authority of the court. *See, Arkansas County v. Freeman & Johnson*, 31 Ark. 266 (1876). Other courts have utilized what has been termed the "implied consent" doctrine to force attorneys to do that which they never expressly agreed. *See Johnson v. Whiteside County*, 110 Ill. 22 (1884).

Notwithstanding the popular belief in the "ancient traditions" from whence it is said the obligation to serve without pay originated, several well-respected courts have looked to the modern framework of government in their analyses, holding that the appointment of unpaid legal labor is impermissible under the Constitution of the United States, at least in civil litigation. *See e.g. In re Nine Applications for Appointment of Counsel in Title VII Proceedings*, 475 F.Supp. 87 (N.D.Ala.1979); *Davison v. Joseph Horne & Co.*, 265 F.Supp. 750, 752 (W.D.Pa.1967) (*dictum*) (*citing United States v. Leser*, 233 F.Supp. 535 (S.D.Cal. 1964)); *Bedford v. Salt Lake County*, 22 Utah 2d 12, 447 P.2d 193 (1968); *Menin v. Menin*, 79 Misc.2d 285, 359 N.Y.S.2d 721 (Sup.Ct.1974), aff'd, 48 A.D.2d 904, 372 N.Y.S.2d 985 (1975); *cf. Allison v. Wilson*, 277 F.Supp. 271, 274 (N.D.Cal.1967) (court cannot compel attorney to serve indigent client in frivolous action). *See also Note, Indigents' Right to Appointed Counsel in Civil Litigation*, 66 Geo.L.J. 113, 138–39 (1977). But *see Note, The Indigent's "right" to Counsel in Civil Cases*, 43 Fordham L.Rev. 989, 1004–06 (1975).

These courts find multifarious problems with the concept of forced attorney labor, including violations of due process "takings" provisions, equal protection, and the Thirteenth Amendment prohibition of "involuntary servitude". The "takings" clause of the Fifth Amendment was relied upon in *Bedford v. Salt Lake City*, 22 Utah 2d 12, 447 P.2d 193 (1968) to declare unconstitutional the taking of an attorney's personal services, skill, and knowledge. As to the "implied consent" theory, the court in *Menin v. Menin*, 79 Misc.2d 285, 359 N.Y. S.2d 721 (S.Ct.1974), aff'd, 48 A.D.2d 904, 372 N.Y.S.2d 985 (1975), found it "irrational" to condition the practice of law upon conditions not reasonably related to an attorney's fitness to practice.

Students of constitutional law will have no difficulty recalling the *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) genre of cases holding that constitutional rights may not be denied or impaired by the placing of irrational conditions on a benefit or privilege.[2] *See also*

---

**2.** *See Frost & Frost Trucking Co. v. Railroad Comm'n*, 271 U.S. 583, 598, 46 S.Ct. 605, 608–09,

70 L.Ed. 1101 (1926) ("[A] state is without power to impose an unconstitutional requirement as

*Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The "involuntary servitude" argument prevailed in a case entitled *Nine Applications for Appointment of Counsel in Title VII Proceedings*, 475 F.Supp. 87 (N.D.Ala.1979), vacated *sub. nom.*, *In re Five Applicants*, 646 F.2d 203 (5th Cir.1981). In that case the court held that such an obligation was neither an obligation commensurate with the privilege to practice law nor was it a duty owed by an attorney to the state or government.

*United States v. Dillon*, 346 F.2d 633 (9th Cir.1965) is perhaps the most oft-cited authority for the thesis that mandatory *pro bono* raises no constitutional concerns. The court in *Dillon* spoke of the "ancient tradition" supporting such conscriptive services. However, historical analysis somewhat dissipates the presumptive validity of the ancient English "officer of the court doctrine" as a justification of forced attorney labor in civil cases. Of this it has been said:

> In the English legal system lawyers were classified as either "attorneys" or "barristers." Attorneys, who were not permitted to plead and defend suits for clients, were considered officers of the court. Attorneys performed ministerial duties for the courts, were admitted to practice by a judge, and were subject to the judge's discipline, just as were members of the court clerical staff. In contrast, English barristers, who pleaded and defended lawsuits, were admitted to practice by self-regulating professional organizations, the Inns of Court. They were never considered officers of the court. Barristers were obligated to accept court appointments to represent the poor because they were required, as citizens, to defer to the commands of the King's courts, not because of their relationship to the courts.

Note: 81 Colum.L.Rev. 366, 374. The author concludes:

a condition for granting a privilege."). *See generally* Hale, *Unconstitutional Conditions and Constitutional Rights*, 35 Colum.L.Rev. 321

Clearly the officer of the court doctrine cannot be used to support court-compelled representation by American lawyers. The doctrine did not apply to barristers, the English lawyers who most closely resemble American litigators, and it was never used to support compelled legal representation. The inapplicability of this doctrine to American attorneys is bolstered by the position of lawyers in the early American legal system.

\*     \*     \*     \*     \*     \*

The elevation of law to its professional status after the Civil War resulted not from the courts' assumption of regulatory power over lawyers, but from the emergence of self-regulating bar associations nationwide. Thus the close relationship between lawyer and court, which had been at the root of the English concept of an "officer of the court," was never present in the United States.

Contemporary judicial decisions, while repeatedly describing attorneys as officers of the court, also recognize that the British model can not properly be applied to the American legal system. For example, in *In re Griffiths*, the Supreme Court rejected the argument that because of the status of attorneys as officers of the court citizenship could be made a condition of admission to the bar. The Court found that the position of lawyers is not like that of clerks, marshals, bailiffs, or other public officials under the courts' supervision—the position of officers of the court in Britain. Therefore, the *Griffiths* Court found no reason to consider whether a citizenship requirement could constitutionally be imposed upon public officials. American lawyers are instead viewed as functioning 'in a three-fold capacity, as self-employed businessmen ..., as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes.' The courts have thus drawn a distinction between lawyers and the ministerial agents of the judiciary who are

(1935); Merrill, *Unconstitutional Conditions*, 77 U.Pa.L.Rev. 879 (1929).

officers of the court, rendering the officer of the court doctrine inapplicable to American attorneys. The doctrine, therefore, cannot be used to uphold the authority of the judiciary to impose otherwise unconstitutional burdens upon attorneys.

*Id.* at 374–76.

According to Shapiro, *The Enigma of the Lawyer's Duty to Serve,* 55 N.Y.L.Rev. 735 (1980):

> In all, relevant precedents have been found in a total of thirty-five American jurisdictions, including the federal. Of these, I believe that in only eighteen of the thirty-four states—a bare majority—and in the federal courts can the law presently be stated in terms approximating an unqualified, enforceable duty to represent an indigent for little or no compensation when ordered to do so. Some jurisdictions not placed in this group might be put there by others, but not all of those included in the majority are beyond debate either.

*Id.* at 756. (citations omitted)

Shapiro found eighteen state jurisdictions in the "majority" of those expressive of the view that the forced, unpaid appointment of counsel in non-criminal litigation presents no constitutional claim. Of these eighteen, Shapiro wrote:

> Of the eighteen state jurisdictions in the majority, I count ten that seem firmly committed, at least without significant dissent or qualification at the appellate level, to the existence and validity of an enforceable duty to serve. Not all of these have considered the problem in recent years, or decades, and in some the issue has been mooted in whole or in part by statutory provisions for adequate compensation. But it remains true that in those states no important judicial rumblings about the scope or impact of the duty have been detected—only an occasional plea to the legislature to provide funds to relieve the bar of the burden imposed.
>
> In the other eight members of the majority, substantial signs of judicial discontent have surfaced. In five of these

states, one or more dissenting judges in the highest state court have taken the position that the practice is invalid, usually on federal constitutional grounds. In a sixth, Georgia, a majority of the court of appeals expressed the view that the practice was unconstitutional but held that it was without jurisdiction to decide on that basis and was bound by an 1873 state supreme court decision to sustain its validity. And in California, where statutory provisions for reasonable compensation cover most instances of appointment, a court confronted in a commitment proceeding with a lack of a specific provision concluded that it had implied authority to fix compensation for appointed counsel. It said: 'We think the days are past when a lawyer could be expected to [serve] solely as a public service. If society is to demand representation by counsel in an expanding variety of proceedings and to insist on a high level of competency in the performance of such representation, then counsel should be paid. Is it reasonable today to attach to a statute which provides for court-appointed counsel in a custodial proceeding an interpretation that appointed counsel will render his services for nothing?' We think not.

*Id.* at 757–58.

This rather abbreviated historical overview suggests the depth and parameters of the issues inherent in Colbert's request that an attorney be temporarily conscripted into the service of the United States judiciary to represent him.

The problem is more acute here where the impoverished civil litigant is a prisoner. As stated in *Payne v. Superior Court of Los Angeles County,* 17 Cal.3d 908, 132 Cal.Rptr. 405, 553 P.2d 565 (1976):

> [T]he indigent prisoner often lacks even the limited resources of his nonprisoner impoverished counterpart. 'The prisoner, a person committed to ... custody ... is effectively severed from society. He has and receives what the custodian grants and nothing more.' (*citing Hooks v. Wainwright,* 352 F.Supp. 163 (M.D. Fla.1972)).

In *Payne,* the state had argued, in fact assumed, that in any case in which an attorney is ordered to represent an indigent, the court would concomitantly order payment from public funds. In response the California Supreme Court said:

> We do not assert such power. If and how counsel will be compensated is for the legislature to decide....

*Payne,* 17 Cal.3d at 920 n. 6, 132 Cal.Rptr. 405, 553 P.2d 565.

The *Payne* court nevertheless concluded that attorneys must serve gratuitously in accordance with their statutorily-imposed ethical obligation not to reject "the cause of the defenseless or the oppressed." Calif.Bus. and Prof.Code, § 6068(h).

In 1985, the California Supreme Court again expressed the hope that the legislative branch would solve the problem of payment for appointed attorneys, but ultimately put the issue on the "back burner". *See Yarbrough v. Superior Court,* 39 Cal.3d 197, 216 Cal.Rptr. 425, 702 P.2d 583 (1985). By 1986, however, the California Court of Appeals found the issue to be "boiling over". *See Cunningham v. Superior Court,* 177 Cal.App.3d 336, 222 Cal. Rptr. 854 (1986).

> According to the court in *Cunningham:* Those courts (referring generally to *United States v. Dillon* [346 F.2d 633] (9th Cir.1965), its predecessors and progeny) that comprise the so-called majority view look wistfully back upon a halycon era when it was imagined that members of the legal profession without any hesitation, stepped forward to provide free representation for indigents.

*Cunningham,* 177 Cal.App.3d at 343, 222 Cal.Rptr. 854.

As the *Cunningham* court quickly noted, this "deeply rooted" tradition and if it validly may be said to have existed at all in American courts, is honored more in the breach than the observance. The court remarked that the judicial power of conscription based upon the notion that an attorney is an officer of the court is founded upon a misunderstanding of the structure of the British court system. In fact, Shapiro termed this interpretation of the so-called "ancient tradition of the bar" "grossly inaccurate." Shapiro concluded:

> To justify coerced, uncompensated legal services on the basis of a firm tradition in England and the United States is to read into that tradition a story that is not there. The occasions on which lawyers have given their time and abilities at little or no cost—either on their own initiative or at a court's request—are surely beyond counting. And the sense that doing so is a fulfillment of a high professional aspiration has often been expressed. (Fn. omitted.) But the notion that an unwilling lawyer could be forced to serve without fee, though not without its advocates over the centuries, seems never to have found universal acceptance. At least before the latter part of the nineteenth century, that notion is even harder to document in particular instances than it is to support with general pronouncements....

Shapiro, *The Enigma of the Lawyer's Duty to Serve, supra,* 55 N.Y.U.L.Rev. at p. 753).

In *Webb v. Baird,* 6 Ind. 13 (1854), the Indiana Supreme Court said of the *noblesse oblige* of the attorney to work without pay:

> The idea of one calling enjoying peculiar privileges, and therefore being more honorable than any other, is not congenial to our institutions. And that any class should be paid for their particular services in empty honors, is an obsolete idea, belonging to another age and to a state of society hostile to liberty and equal rights.

*Webb,* 6 Ind. at 16.

It cannot be disputed that the assistance of the poor is a legitimate governmental function. But, this goal cannot be accomplished by burdening one particular class of persons in an effort to solve what is clearly a governmental, societal, and nationwide problem. No other profession is similarly conscripted to aid the poor.

Of this, the *Payne* court wrote:

> As one commentator has noted: 'It is unfair to put on any working group the burden of providing for the needy out of

its stock in trade. No one would suggest that the individual grocer or builder should take the responsibility of providing the food and shelter needed by the poor. The same conclusion applies to the lawyer. The lawyer's stock in trade is intangible—his time fortified by his intellectual and personal qualities, and burdened by his office expenses. To take his stock in trade is like stripping the shelves of the grocer or taking over a subdivision of the builder.' Cheatham, *Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar* (1965) 12 UCLA L.Rev. 438, 444; *see also, The Uncompensated Appointed Counsel System: A Constitutional and Social Transgression* (1972) 49 Ky.L.J. 710, 715. *Payne,* 177 Cal.App.3d at 349, 222 Cal. Rptr. 854. *See also Knox County Council v. State,* 217 Ind. 493, 29 N.E.2d 405, 412 (1940).

It is obvious in light of *Mallard* that if the federal judiciary possesses the authority to compel an unwilling attorney to serve without pay in the service of an incarcerated civil rights plaintiff, such power must derive from the Constitution. This court, after all, may assert no more power than conferred or allowed by Article III.

Because Article III is not lengthy, it is here quoted in full:

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at states Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Section 3. Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

The inquiry then is whether the challenged authority is within the "judicial power" conferred upon this "inferior court" by Article III. This court does not believe that history supports the proposition that the drafters of the Constitution intended the judicial branch of government to wield such power as a sword over private attorneys. Private attorneys are not ministerial agents "put here" to solve the administrative problems of the federal judiciary, and it is doubtful, in this court's

view, that the founding fathers believed otherwise.

Nonetheless, even if it can be said that the power is "inherent" in the "judicial power" conferred upon this court by Article III, this power is subject to any implied restrictions thereof imposed by virtue of the Fifth Amendment's "due process," "takings," and "equal protection" components. This court agrees with those courts which have held that attorneys do not "impliedly consent" to their being forced to represent civil rights litigants without pay, just as hairdressers, also licensed by the state, do not impliedly consent to perform free haircuts for the needy.

*Mallard* teaches that attorneys are under no statutorily-imposed obligation to champion the cause of an indigent civil rights plaintiff. If no statute requires it and attorneys have not "impliedly consented" to do it, the duty could exist only by virtue of the power of the courts inherent in the very nature of American federal jurisprudence. The court, quite simply, does not believe such power is essential to the judicial function or is within its sphere of responsibility.

It is unfair to single out a class defined as including the legal profession and as a sub-class, the relatively few litigation attorneys qualified and able to represent the poor, to bear a burden that belongs to society as a whole and is for the legislative branch to resolve.

Thus, even though Colbert's civil rights action is sufficiently meritorious to have thus far survived motions to dismiss and for summary judgment and touches on rights at the very cornerstone of a free society, *i.e.* the right to be free from unreasonable search and seizure and from unwarranted detention, this court lacks the "inherent power" to appoint an unwilling attorney to assist Colbert in these proceedings.

As § 1915(d) makes clear, this court may "request" an attorney to donate his time, knowledge and skill in Colbert's behalf. The court declines to do so. This disinclination is not based upon the relative merits of Colbert's case. As "strong" or "weak"

as Colbert's case may be, there are clearly hundreds, if not thousands, of equally meritorious *pro se* civil cases pending in the federal courts in this country. This court is not equipped with the machinery or the manpower to act as a telephonic lawyer-referral service. If this court has the *duty* to attempt to persuade attorneys to accept such cases, how many telephone calls must the court place to the bar before the duty is discharged? As any trial judge who has attempted to appoint lawyers to represent indigent plaintiffs in civil cases should be able to attest, the process seems to be never ending. A lawyer is contacted by phone or mail, and while few of them are "brave enough" or "foolish enough" to decline the appointment outright, they invariably have a long list of reasons why they cannot represent the indigent in this particular case or, in fact, in any case. The court then is relegated to either attempting to "strong arm" them into accepting the appointment, or to make numerous other calls, until someone is found who will handle the case. In short, the court declines to devote scarce judicial and administrative time and essential personnel to the task of finding attorneys willing and able to represent, without pay, Colbert, and dozens of other litigants who annually file *pro se* complaints in this court.

Though Colbert would, perhaps, be benefitted by counsel, the court will not order counsel to serve without pay, is not equipped to "request" such service, and is "not about" to order Congress to appropriate money with which to pay appointed counsel.

■ The court notes that there is a split of authority as to the appealability of orders denying the appointment of counsel. In *Henry v. City of Detroit Manpower Department*, 474 U.S. 1036, 106 S.Ct. 604, 88 L.Ed.2d 582 (1985), the Supreme Court declined to accept certiorari to resolve the conflict as to the "plainly recurring question". *See Henry*, 474 U.S. at 1037, 106 S.Ct. at 604 (J. White and J. Blackmun dissenting from denial of grant of certiorari). The same avoidance of this issue was again present in *Welch v. Smith*, 484 U.S.

903, 108 S.Ct. 246, 98 L.Ed.2d 203 (1987). Justices White and Blackmun again dissented from the denial of certiorari in that case:

> The issue here is whether an order denying a civil rights plaintiff's motion for the appointment of counsel is immediately appealable under 28 U.S.C. § 1291 as interpreted by *Cohen v. Beneficial Indus. Loan Co.*, 337 U.S. 541 [69 S.Ct. 1221, 93 L.Ed. 1528] (1949) and its progeny.

By 1987, four circuits had held such orders immediately appealable. *See Slaughter v. City of Maplewood*, 731 F.2d 587 (8th Cir.1984); *Hudak v. Curators of Univ. of Mo.*, 586 F.2d 105 (8th Cir.1978); *Robbins v. Maggio*, 750 F.2d 405 (5th Cir.1985); *Brooks v. Central Bank of Birmingham*, 717 F.2d 1340 (11th Cir.1983); *Bradshaw v. Zoological Society of San Diego*, 662 F.2d 1301 (9th Cir.1981). Six circuits have held such orders not appealable. *See Henry v. City of Detroit Manpower Dept.*, 763 F.2d 757 (6th Cir.) (*en banc*), vacating *Henry v. City*, 739 F.2d 1109 (6th Cir.1984); *Smith-Bey v. Petsock*, 741 F.2d 22 (3rd Cir.1984); *Appleby v. Meachum*, 696 F.2d 145 (1st Cir.1983); *Randle v. Victor Welding*, 664 F.2d 1064 (7th Cir.1981) overruling *Jones v. WFYR Radio/RKO General*, 626 F.2d 576 (7th Cir.1980); *Cotner v. Mason*, 657 F.2d 1390 (10th Cir.1981); *Miller v. Pleasure*, 425 F.2d 1205 (2nd Cir.1970). The Ninth Circuit has apparently adopted the position that such orders are appealable in a Title VII action but not in a § 1983 action. *Compare, Wilborn v. Escalderon*, 789 F.2d 1328 (9th Cir.1986), with *Bradshaw, supra.*

Thus, the Supreme Court proponents of a rule of immediate appealability of such denials, implementing the "Rule of four" for the granting of certiorari in these cases, have failed to persuade the court that resolution by the high court is essential. However, this court need not embark on an extended *Cohen* analysis because Eighth Circuit precedent on this issue is binding on this court. *Slaughter* controls, or appears to control, this issue. Accordingly, this court holds that the denial of appointed counsel to Colbert is appealable under 28 U.S.C. § 1291.

Even if not this court is of the opinion that the order in this case involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order will materially advance the ultimate termination of the litigation. Therefore, the question is appealable under 28 U.S.C. § 1292(b) if application is made to the court of appeals within ten days after the entry of the order accompanying this opinion. Any appeal under § 1291 or 1292(b) shall stay all proceedings in this court pending resolution of the appeal.

Colbert's motion for the appointment of counsel will be denied.