64 F.3d 1250
 95 Cal. Daily Op. Serv. 6352, 95 Daily Journal
D.A.R. 10,855
RUMSEY INDIAN RANCHERIA OF WINTUN INDIANS; Table Mountain
Rancheria; Cher-Ae Heights Indian Community of the Trinidad
Rancheria; San Manual Band of Mission Indians, Viejas
Reservation of the Capitan Grande Band of Diegueno Mission
Indians and Hopland Band of Pomo Indians; Barona Band of
Mission Indians; Sycuan Band of Mission Indians; Agua
Caliente Band of Cahuilla Indians, Plaintiffs-Appellees,
v.
Pete WILSON, Governor; State of California, Defendants-Appellants.
RUMSEY INDIAN RANCHERIA OF WINTUN INDIANS; Table Mountain
Rancheria; Cher-Ae Heights Indian Community of the Trinidad
Rancheria; San Manual Band of Mission Indians, Viejas
Reservation of the Capitan Grande Band of Diegueno Mission
Indians and Hopland Band of Pomo Indians; Wintun Indians;
San Manual Band of Mission Indians; Cabazon Band of Mission
Indians; The Santa Ynez Band of Chumash Mission Indians of
the Santa Ysabel Reservation, California; Viejas
Reservation of the Capitan Grande Band of Diegueno Mission
Indians; San Manual Band of Mission Indians; The Hopland
Band of Pomo Indians; The Sycuan Band of Mission Indians;
The Morongo Band of Mission Indians; The Santa Rosa Band of
Tache Indians; The Cachil Dehe Band of Wintun Indians of
the Colusa Indian Community; The Soboba Band of Cahuilla
Mission Indians; The Robinson Band of Pomo Indians;
The Agua Caliente Band of Cahuilla Indians; and The Barona
Group of the Capitan Grande Band of Mission Indians,
Plaintiffs-Appellees-Cross-Appellants,
v.
Pete WILSON, Governor; State of California,
Defendants-Appellants-Cross-Appellees.
 Nos. 93-16609, 93-16745.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1994.
Decided Nov. 15, 1994.
As Amended on Denial of Rehearing and Rejection of
Suggestion for Rehearing En Banc Aug. 11, 1995.
 
 Howard L. Dickstein, Dickstein & Merin, Sacramento, CA; Art Bunce, Escondido, CA; George Forman, Alexander & Karshmer, Berkeley, CA, for plaintiffs-appellees-cross-appellants.
 Manuel M. Medeiros, Deputy Atty. Gen., Sacramento, CA, for defendants-appellants-cross-appellees.
 Appeals from the United States District Court for the Eastern District of California.
 Before: WALLACE, Chief Judge; O'SCANNLAIN, Circuit Judge; KELLEHER,* District Judge.
 Opinion by Judge O'SCANNLAIN; Concurrence by Chief Judge WALLACE; Dissent to Order by Judge CANBY; Concurrence to Dissent by Judges FERGUSON and NORRIS.
 ORDER
 The opinion filed on November 15, 1994 at slip op. 13873 is amended as follows:
 The panel has voted to deny the petitions for rehearing. Chief Judge Wallace and Judge O'Scannlain have voted to reject the suggestions for rehearing en banc, and Judge Kelleher has so recommended.
 The full court was advised of the suggestions for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.
 The petitions for rehearing are DENIED and the suggestions for rehearing en banc are REJECTED.
 CANBY, Circuit Judge, joined by PREGERSON, REINHARDT, and HAWKINS, Circuit Judges, dissenting from the denial of rehearing en banc:
 This is a case of major significance in the administration of the Indian Gaming Regulatory Act ("IGRA") and it has been decided incorrectly, in a manner that conflicts with the Second Circuit's interpretation of the same statutory language. The result is to frustrate the scheme of state-tribal negotiation that Congress established in IGRA. We should have granted rehearing en banc to prevent the near-nullification of IGRA in a circuit that encompasses a great portion of the nation's Indian country. Our failure to do so may close the only route open to many tribes to escape a century of poverty.
 Rumsey holds that California, which permits several varieties of Class III gambling, has no duty under IGRA to negotiate with the tribes over the tribes' ability to conduct any game that is illegal under California law. This ruling effectively frustrates IGRA's entire plan governing Class III Indian gaming. The primary purpose of IGRA, as set forth in the Act, is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. Sec. 2702(1). IGRA's otherwise drastic extension of state gaming law to Indian country (to be enforced only by the federal government) was modified by IGRA's process by which the states and tribes could arrive at compacts specifying what games might be allowed and who might have jurisdiction to enforce gaming laws. See 25 U.S.C. Sec. 2710(d)(3); 18 U.S.C. Sec. 1166(c)(2) (exempting Class III gaming conducted pursuant to a tribal-state compact from the application of state gaming laws extended into Indian country by Sec. 1166(a)). The whole idea was to foster these compacts. That goal is defeated if the details of the state's regulatory schemes, allowing some games and prohibiting others, apply if the state does nothing. Thus the Second Circuit, in arriving at a conclusion precisely opposite to that of Rumsey, stated:
 Under the State's approach, ... even where a state does not prohibit class III gaming as a matter of criminal law and public policy, an Indian tribe could nonetheless conduct such gaming only in accord with, and by acceptance of, the entire state corpus of laws and regulations governing such gaming. The compact process that Congress established as the centerpiece of the IGRA's regulation of class III gaming would thus become a dead letter; there would be nothing to negotiate, and no meaningful compact would be possible.
 Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1030-31 (2d Cir.1990).[1]
 The Second Circuit's fears of turning IGRA's compact process into a dead letter are well-founded. It is well to keep in mind that the issue here is not whether California must allow every game the tribes want to conduct; it is merely whether California has a duty to negotiate with the tribes to determine what games should be conducted, on what scale, and who has jurisdiction to enforce gaming laws. In passing IGRA, Congress knew that states and tribes both had important interests at stake. If a state has a genuine prohibitory public policy against all Class III gaming, as some states do, it can rest on that policy and not entertain the possibility of Indian Class III gaming within its borders. States like California that have no such wholesale public policy against Class III gaming must, under IGRA, reach an accommodation between their interests and the strong interests of the tribes in conducting such gaming. IGRA's method of reaching such an accommodation is by negotiation between the two affected groups. IGRA imposes on the states a duty to negotiate compacts in good faith. That duty is enforceable in federal court with the aid, if necessary, of a court appointed mediator to arrive at a compact and the Secretary of the Interior to dictate a compact if the parties do not accept the mediator's ruling. 25 U.S.C. Sec. 2710(d)(7). But under Rumsey, this whole process is nipped in the bud if the tribe seeks to operate games that state law, criminal or regulatory, happens to prohibit. The state has no duty to begin negotiations, even though under IGRA a compact may permit the tribe to operate games that state law otherwise prohibits. 18 U.S.C. Sec. 1166(c)(2). The State thus has no incentive to negotiate, and there is no system to require negotiation. IGRA is rendered toothless.
 Such a nullifying interpretation of IGRA might be understandable if it were required by the plain words of the statute, but it is not. Rumsey defeats the congressional plan for Class III gaming by a manifestly flawed interpretation of the statutory language. In deciding that California had no duty to negotiate with the plaintiff tribes, the Rumsey opinion asked and answered the wrong question. IGRA provides:
 Class III gaming activities shall be lawful on Indian lands only if such activities are--
 ....
 (B) located in a State that permits such gaming for any purpose by any person, organization, or entity....
 25 U.S.C. Sec. 2710(d)(1)(B) (emphasis added). Thus the state must negotiate with a tribe if the state "permits such gaming." The Rumsey opinion regards the key question as being whether the word "permits" is ambiguous; it holds that the word is not ambiguous, so the State need not bargain. But the proper question is not what Congress meant by "permits," but what Congress meant by "such gaming." Did it mean the particular game or games in issue, or did it mean the entire category of Class III gaming? The structure of IGRA makes clear that Congress was dealing categorically, and that a state's duty to bargain is not to be determined game-by-game. The time to argue over particular games is during the negotiation process.
 The only natural reading of section 2710(d)(1)(B) is that, when Congress says "Class III gaming activities shall be lawful ... if located in a State that permits such gaming," then "such gaming" refers back to the category of "Class III gaming," which is the next prior use of the word "gaming." Rumsey interprets the statutory language as if it said: "A Class III game shall be lawful ... if located in a State that permits that game." But that is not what Congress said, and it is not a natural reading of the statutory language. The plain language cuts directly against Rumsey; Congress allows a tribe to conduct Class III gaming activities (pursuant to a compact) if the State allows Class III gaming by anyone.
 Furthermore, Class II gaming is governed by virtually identical language in section 2710(b)(1)(A). A tribe may conduct and regulate "Class II gaming ... if such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity...." 25 U.S.C. Sec. 2710(b)(1)(A) (emphasis added). We have held that the state cannot allow or disallow Class II Indian gaming game-by-game. Sycuan Band of Mission Indians v. Miller, 54 F.3d 535 (9th Cir.1995) (amended opinion). Our decision in Sycuan Band followed the reasoning of the Supreme Court in California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the seminal Indian gaming case that ultimately led to the passage of IGRA. In deciding for purposes of Public Law 280 whether California's prohibition of high-stakes bingo could be enforced against the Band, the Supreme Court noted that "[t]he shorthand test is whether the conduct at issue violates the State's public policy." After reviewing California's treatment of gambling, the Court stated:
 In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular.
 Id. at 211, 107 S.Ct. at 1089 (emphasis added). Thus, Cabazon Band ascertained California's public policy at a level of generality far above that of the individual game in issue, and concluded that the Band could conduct high-stakes bingo even though California made that activity a misdemeanor. We applied a similarly broad and categorical approach to Class II gaming in Sycuan Band.
 The Rumsey opinion refuses to apply the reasoning of Cabazon Band and Sycuan Band, and instead holds that a class-wide, categorical approach is precluded by the "unambiguous" plain words of section 2710(d)(1)(B), even though identical words in section 2710(b)(1)(A) require a contrary result for Class II gaming. The majority in Rumsey justifies its interpretation by referring to the Senate Committee Report on IGRA, which approves the approach of Cabazon Band for Class II gaming but says nothing about Cabazon Band 's applicability to Class III gaming. See Sen.Rep. No. 100-446, 1988 U.S.C.C.A.N. 3071, 3076. But we should not read a congressional negative into a committee report's failure to mention Cabazon Band in regard to Class III gaming. Cabazon Band dealt with games that IGRA placed in Class II, and that is explanation enough why the discussion of Cabazon Band in the Committee's report arose only in connection with Class II gaming. The fact remains that Congress wrote provisions of essentially identical wording and structure to govern both Class II and Class III gaming. We should give them both the same categorical meaning.
 Rumsey has thus misconstrued IGRA's Class III gaming provisions, and has done so in a manner that defeats Congress's intention and causes great economic harm to numerous tribes. With all respect to the Rumsey panel, we dissent from the denial of rehearing en banc.
 FERGUSON and NORRIS, Senior Circuit Judges:
 We agree with the views expressed by Judge Canby.
 OPINION
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We decide whether certain gaming activities are permitted under California law and thus subject to tribal-state negotiation under the Indian Gaming Regulatory Act.
 
 
 2
 * Numerous federally recognized Indian tribes currently engage in various gaming activities on tribal lands in California. Desiring to engage in additional activities (the "Proposed Gaming Activities"), several tribes asked the State of California (the "State") to negotiate a compact permitting the operation of certain stand-alone electronic gaming devices[1] and live banking and percentage card games.[2] The State refused to negotiate with the tribes, asserting that the Proposed Gaming Activities were illegal under California law.
 
 
 3
 The State and seven tribes subsequently entered into a stipulation to seek judicial determination of whether the State was obligated to negotiate with the tribes. These tribes filed a complaint for declaratory judgment with the district court under the Indian Gaming Regulatory Act ("IGRA"), 25 Secs. U.S.C. 2701-2721. Four other complaints, filed by different Indian tribes, were consolidated with this action (plaintiffs collectively referred to as the "Tribes").
 
 
 4
 The parties filed cross-motions for summary judgment. The district court awarded summary judgment to the Tribes, finding that, except for banking and percentage card games using traditional casino game themes, the Proposed Gaming Activities were a proper subject of negotiation. The State timely appealed, and the Tribes filed a cross-appeal.
 
 II
 
 5
 Enacted in 1988 as means of "promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. Sec. 2702(1), IGRA creates a framework for Indian tribes to conduct gaming activities on tribal lands. IGRA divides gaming into three classes. Spokane Tribe of Indians v. Washington, 28 F.3d 991, 993 (9th Cir.1994). " 'Class I' consists of social games for minimal prizes and traditional Indian games; 'Class II' includes Bingo and similar games of chance such as pull tabs and lotto; 'Class III' includes all games not included in Classes I or II." Id.; 25 U.S.C. Sec. 2703(6)-(8). The parties agree that the Proposed Gaming Activities are Class III games.
 
 
 6
 A tribe seeking to operate Class III gaming activities on tribal lands generally may do so only under a compact. A tribe initiates the compacting process by asking a state to engage in negotiations. 25 U.S.C. Sec. 2710(d)(3)(A). IGRA obligates the state to negotiate in good faith with the tribe; and, if the parties reach agreement, they sign a Tribal-State compact. Id. at Sec. 2710(d)(3)(A)-(B).
 
 
 7
 If a state refuses to negotiate in good faith, the tribe can bring a civil suit, whereupon a federal district court may order the state and tribe to conclude a compact within 60 days. Id. at Sec. 2710(d)(7)(A)-(B). If a compact is not reached within that period, the tribe and the state must submit their last best offers to a court-appointed mediator, who selects one of the offers as the compact. Id. at Sec. 2710(d)(7)(B)(iv). The state then has 60 days to decide whether to consent to the compact. Id. at Sec. 2710(d)(7)(B)(vi). If the state does not approve the compact, the Secretary of the Interior may prescribe regulations for Class III gaming on tribal lands. Id. at Sec. 2710(d)(7)(B)(vii)(II); Spokane, 28 F.3d at 993.
 
 
 8
 In the instant case, the State opted not to negotiate over the Proposed Gaming Activities. The State asserts two reasons why it need not negotiate with the Tribes. The first reason is that the Act itself does not require negotiation. The second reason is that the Act violates the Tenth Amendment. Because the first reason persuades us, we do not reach the second.
 
 
 9
 The State contends that IGRA does not obligate it to negotiate with the Tribes over the Proposed Gaming Activities. IGRA provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are ... located in a State that permits such gaming for any purpose by any person, organization, or entity...." 25 U.S.C. Sec. 2710(d)(1)(B) (emphasis added). Consequently, where a state does not "permit" gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them.
 
 
 10
 The parties disagree as to whether California "permits" the Proposed Gaming Activities. The State's argument is straightforward: the Proposed Gaming Activities are illegal. California law prohibits the operation of a banked or percentage card game as a misdemeanor offense. Cal.Penal Code Sec. 330 (Deering 1993). In addition, according to the State, the stand-alone electronic gaming machines sought by the Tribes are electronic "slot machines." California law prohibits the operation of slot machines as a misdemeanor offense, Cal.Penal Code Secs. 330a, 330b, and a California appellate court has indicated that electronic machines of the sort requested by the Tribes fall within the scope of this prohibition. Score Family Fun Center, Inc. v. County of San Diego, 225 Cal.App.3d 1217 (1990).
 
 
 11
 The Tribes offer a broader reading of IGRA, claiming that a state "permits" a specific gaming activity if it "regulates" the activity in general rather than prohibiting it entirely as a matter of public policy. Under this approach, a specific illegal gaming activity is "regulated," rather than "prohibited," if the state allows the operation of similar gaming activities. The Tribes observe that video lottery terminals, parimutuel horse racing, and nonbanked, nonpercentage card gaming are legal in California. Because the Tribes view these activities as functionally similar to the Proposed Gaming Activities, they conclude that California regulates, and thus permits, these activities.
 
 
 12
 The Tribes cite to the Supreme Court's pre-IGRA decision, California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), in support of their view. In Cabazon, the State of California objected to an Indian tribe's operation of bingo games on tribal land. The State argued that the tribe's bingo games violated a penal statute imposing prize limits and limiting bingo operators to unpaid members of charities. When the State sought to enforce its penal statute against the tribe, the tribe brought a declaratory judgment action. The district court awarded summary judgment to the tribe, and this court affirmed.
 
 
 13
 The Supreme Court held that summary judgment properly was granted. At the time, gaming on tribal lands fell under Public L. 280. Pub.L. No. 280, 67 Stat. 588 (codified as amended in 18 U.S.C. Sec. 1162, 28 U.S.C. Sec. 1360). Under Public Law 280, Congress granted states the right to extend their criminal jurisdiction over offenses committed on tribal lands, 18 U.S.C. Sec. 1162, but granted states only limited civil jurisdiction over these lands. 28 U.S.C. Sec. 1360(a). Against this background, the Court observed that, "when a State seeks to enforce a law within an Indian reservation under the authority of Public Law 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation ..., or civil in nature." 480 U.S. at 208, 107 S.Ct. at 1088.
 
 
 14
 The Court held that the fact that "an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub.L. 280." Id. at 211, 107 S.Ct. at 1089. Instead, it explained that there was:
 
 
 15
 a distinction between state "criminal/prohibitory" laws and state "civil/regulatory" laws: if the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.
 
 
 16
 Id. at 209, 107 S.Ct. at 1088 (emphasis added). Applying this test to bingo gaming in California, the Court found that California law permitted a large variety of gaming activities, including bingo. Id. at 210-11, 107 S.Ct. at 1088-89. It concluded that the state "regulates rather than prohibits gambling in general and bingo in particular," id. at 211, 107 S.Ct. at 1089, and held that the Indian tribes thus were entitled to engage in their gaming activities.
 
 
 17
 Congress enacted IGRA in response to Cabazon. Spokane, 28 F.3d at 993. The Tribes assert that IGRA codified Cabazon 's "criminal/regulatory" test. Under this approach, which was adopted by the district court in this case, a court must determine whether a gaming activity, even if illegal, violates a state's public policy. If it does, then the activity is "criminally" prohibited. If it does not, then the activity is merely "regulated" and, thus, "permitted" for the purpose of applying IGRA.
 
 
 18
 We reject this reading of IGRA. In interpreting IGRA, we use our traditional tools of statutory construction. "Interpretation of a statute must begin with the statute's language." Mallard v. United States Dist. Ct. for the So. Dist. of Iowa, 490 U.S. 296, 301, 109 S.Ct. 1814, 1817, 104 L.Ed.2d 318 (1989). "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." United States v. Ron Pair Enters., 489 U.S. 235, 243, 109 S.Ct. 1026, 1031-32, 103 L.Ed.2d 290 (1989) (quotation omitted). In most cases, "if we find the statutory language unambiguous, then we will not resort to legislative history" to guide our review. Fernandez v. Brock, 840 F.2d 622, 632 (9th Cir.1988). Finally, although statutes benefitting Native Americans generally are construed liberally in their favor, we will not rely on this factor to contradict the plain language of a statute. Cf. Seldovia Native Ass'n v. Lujan, 904 F.2d 1335, 1342 (9th Cir.1987).
 
 
 19
 Section 2710(d)(1)(b) is unambiguous. In United States v. Launder, 743 F.2d 686 (9th Cir.1984), we adopted a dictionary definition of the term "permit" as meaning " '[t]o suffer, allow, consent, let; to give leave or license; to acquiesce, by failure to prevent, or to expressly assent or agree to the doing of an act.' " Id. at 689 (quoting from Black's Law Dictionary ). Clearly, California does not allow banked or percentage card gaming. With the possible exception of video lottery terminals,[3] electronic gaming machines fitting the description of "slot machines" are prohibited.
 
 
 20
 The fact that California allows games that share some characteristics with banked and percentage card gaming--in the form of (1) banked and percentage games other than card games and (2) nonbanked, nonpercentage card games is not evidence that the State permits the Proposed Gaming Activities. Nor is it significant that the state lottery, if not technically a slot machine, is functionally similar to one. In Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273 (8th Cir.1993), a tribe sought to operate a traditional form of keno as well as casino-type gambling. When the State of South Dakota refused to negotiate, the tribe filed suit, arguing that the video keno and charity-run casino-type gaming were legal in the state. The Eighth Circuit rejected this argument. First, it found that the state permitted charities to operate bingo and raffles, but not casino-type gambling. Second, it held that the state:
 
 
 21
 need not negotiate traditional keno if only video keno is permitted in South Dakota. The "such gaming" language of 25 U.S.C. Sec. 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming it does not presently permit. Because video keno and traditional keno are not the same and video keno is the only form of keno allowed under state law, it would be illegal ... for the tribe to offer traditional keno to its patrons.
 
 
 22
 Id. at 279. The court thus concluded that South Dakota had not failed to negotiate in good faith by refusing to negotiate over traditional keno and casino-type gaming. Accord Coeur D'Alene Tribe v. Idaho, 842 F.Supp. 1268, 1280 n. 9 (D.Idaho 1994), aff'd, 51 F.3d 876 (9th Cir.1995).
 
 
 23
 We agree with the approach taken by the Eighth Circuit. IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming. Instead, the statute says only that, if a state allows a gaming activity "for any purpose by any person, organization, or entity," then it also must allow Indian tribes to engage in that same activity. 25 U.S.C. Sec. 2710(d)(1)(B). In other words, a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have.[4]
 
 III
 
 24
 Because we find the plain meaning of the word "permit" to be unambiguous, we need not look to IGRA's legislative history. See United States v. Taylor, 487 U.S. 326, 344-46, 108 S.Ct. 2413, 2424-2425, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring). However, a brief examination helps to clarify why the word has different meanings with respect to Class II and Class III gaming.
 
 
 25
 The primary source of IGRA's legislative history, the Senate Report accompanying its passage, does not describe the circumstances in which a state "permits" a gaming activity in the context of Class III gaming. The only relevant passages occur in the Senate Report's discussion of Class II gaming:
 
 
 26
 [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently and notably by the Supreme Court in Cabazon.
 
 
 27
 S.Rep. No. 446, 100th Cong., 2d Sess., reprinted in 1988 U.S.C.C.A.N. 3071, 3076. The Senate Report continues:
 
 
 28
 The phrase "for any purpose by any person, organization or entity" makes no distinction between State laws that allow class II gaming for charitable, commercial, or governmental purposes, or the nature of the entity conducting the gaming. If such gaming is not criminally prohibited by the State in which tribes are located, then tribes, as governments, are free to engage in such gaming.
 
 
 29
 Id. at 3082.
 
 
 30
 The Tribes point to those statements as evidence that Congress intended that Cabazon 's "criminal/regulatory" test govern for the purposes of determining whether a Class II gaming activity is permitted on Indian lands. The Tribes then observe that IGRA's Class II gaming provisions contain the same language used for Class III gaming: "An Indian tribe may engage in ... class II gaming on Indian lands ... if ... such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity...." 25 U.S.C. Sec. 2710(b)(1)(A) (emphasis added). Relying upon the maxim that identical language in a statute should be interpreted to have the same meaning, the Tribes infer that the Senate Report establishes the applicability of the Cabazon test to Class III gaming.
 
 
 31
 However, that inference is incorrect. "Identical words appearing more than once in the same act, and even in the same section, may be construed differently if it appears they were used in different places with different intent." Vanscoter v. Sullivan, 920 F.2d 1441, 1448 (9th Cir.1990). Such is the case for Class III gaming. The Senate Report repeatedly links the Cabazon test to Class II gaming while remaining silent as to Class III gaming--a fact that itself suggests that Class II and III provisions should be treated differently. Cf. Arizona Elec. Power Coop. v. United States, 816 F.2d 1366, 1375 (9th Cir.1987) (expressio unius principle). Further, Congress envisioned different roles for Class II and Class III gaming. It intended that tribes have "maximum flexibility to utilize [Class II] games such as bingo and lotto for tribal economic development," S.Rep. No. 466, 1988 U.S.C.C.A.N. at 3079, and indicated that Class II gaming would be conducted largely free of state regulatory laws. Id. at 3079, 3082. Congress was less ebullient about tribes' use of Class III gaming, however, and indicated that Class III gaming would be more subject to state regulatory schemes. Id. at 3083-84. Even if we found it necessary to rely upon IGRA's legislative history, it supports the plain meaning of the term "permit" with regard to IGRA's Class III provisions.[5]IV
 
 
 32
 With the possible exception of slot machines in the form of video lottery terminals, California has no obligation to negotiate with the Tribes on the Proposed Gaming Activities, and the trial court judgment is reversed to that extent. We affirm the district court's judgment that the State need not negotiate over banked or percentage card games with traditional casino themes. We remand to the district court to consider the limited question of whether California permits the operation of slot machines in the form of the state lottery or otherwise.
 
 
 33
 AFFIRMED in part, REVERSED in part, and REMANDED. Each party to bear its own costs.
 
 WALLACE, Chief Judge, concurring:
 
 34
 I concur with parts I and II of this opinion. However, I concur only in the result of part III, because the discussion of the legislative history of the Indian Gaming Regulatory Act (Act) is unnecessary. Having concluded that the plain language of the Act controls this case, our opinion should end. The discussion of the Act's legislative history gives the impression that the Act is not as clear as we say, and that some additional reason is required before we hold as we do. "Where we are not prepared to be governed by what the legislative history says--to take, as it were, the bad with the good--we should not look to the legislative history at all. This text is eminently clear, and we should leave it at that." United States v. Taylor, 487 U.S. 326, 345, 108 S.Ct. 2413, 2424, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring).
 
 
 
 *
 The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 We recognize that Rumsey 's approach is supported by the Eighth Circuit, Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273 (8th Cir.1993), but for the reasons stated we believe that the Second Circuit has much the better overview of IGRA
 
 
 [1]
 Included among these electronic games are electronic pull tab machines, video poker devices, video bingo devices, video lotto devices, and video keno devices. The parties agree that California allows these games to be played in nonelectronic formats
 
 
 [2]
 A card game is "banked" if a gaming operator participates in the game with the players and acts as a house bank, paying all winners and retaining all other players' losses. Sullivan v. Fox, 189 Cal.App.3d 673, 679, 235 Cal.Rptr. 5 (1987). A card game is a "percentage" game if the gaming operator has no interest in the outcome of a game but takes a percentage of all amounts wagered or won. Id
 
 
 [3]
 The district court expressly declined to reach the question of whether California allows the operation of a slot machine in the form of the state lottery. The State concedes that, if the state lottery is in fact a slot machine, then California "permits" the operation of these devices. The district court also apparently declined to reach the Tribes' questionable argument that California allows the operation of slot machines in the form of punchboards
 
 
 [4]
 Our decision in Sycuan Band of Mission Indians v. Roache, No. 93-55430, slip op. 4879 (9th Cir. Apr. 28, 1995) is not to the contrary. In Sycuan Band, this court held that California lacked jurisdiction to enforce its laws against certain Class III gaming activities on tribal lands because IGRA vests exclusive jurisdiction with the federal government. Slip op. at 4889 (citing 18 U.S.C. Sec. 1166(d)). In the course of its analysis, the court also suggested that, even if the gaming devices at issue were Class II gaming, California would lack authority to enforce its law on tribal lands. The court relied on the statement in Cabazon that California "regulates rather than prohibits gambling in general and bingo in particular." Slip op. at 4889 (quoting Cabazon, 480 U.S. at 211, 107 S.Ct. at 1089). The court interpreted this statement expansively to mean that California's gambling laws regarding Class II-type gaming fall on the civil/regulatory side of Cabazon 's test; thus, California lacked jurisdiction to enforce these laws on tribal lands
 As an initial matter, the Sycuan Band court's analysis of Cabazon Band in the context of Class II gaming is dicta; the court expressly held that the gaming at issue was Class III gaming. Slip op. at 4892-98. Moreover, in its discussion of Cabazon Band, the Sycuan Band court expressed no opinion on its relevance for Class III-type gaming, slip op. at 4888, the type of gaming at issue here. For the reasons expressed above, we have determined that the analysis of whether a type of gaming is permitted by a state under IGRA differs depending on the class of gaming involved.
 
 
 [5]
 The Tribes cite to Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024 (2d Cir.1990), cert. denied, 499 U.S. 975, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991), as authority for attributing the "Class II" legislative history to Class III. In Mashantucket, an Indian tribe sought to engage in "games of chance" that the State of Connecticut allowed charities to operate during "Las Vegas nights." Relying on the "Class II" legislative history, the court held that Cabazon 's "criminal/regulatory" test applied to Class III gaming. Id. at 1030-31. It concluded that, because Connecticut permitted the games of chance to be operated by some persons in the state, the state had to negotiate over those games with the Tribes
 While we disagree, for the reasons expressed above, with the Mashantucket court's use of the Class II legislative history to interpret IGRA's Class III provisions, we believe that the court nevertheless reached the correct result. As we have explained, IGRA's text plainly requires a state to negotiate with a tribe over a gaming activity in which the state allows others to engage, and no resort to legislative history is necessary to support this conclusion. Because Connecticut allowed charities to operate games of chance, it had to negotiate with the tribe over these games.
 The Tribes also assert that the State is barred by issue preclusion from relitigating Cabazon 's finding that California "regulates ... gambling in general." 480 U.S. at 211, 107 S.Ct. at 1089. Since we do not apply the Cabazon "criminal/regulatory" test here, we need not reach this argument.