Dear Speaker Rubio:
The Governor and the Seminole Tribe of Florida have been negotiating a Class III gaming compact pursuant to the federal Indian Gaming Regulatory Act (IGRA). The Florida Legislature may be called upon to ratify the compact. You, therefore, have asked for my opinion on substantially the following questions:
1) Where state law authorizes only certain Class III gaming activities, does the Indian Gaming Regulatory Act mandate that a state negotiate with a tribe over Class III gaming activities that are specifically prohibited by state law?
2) If the state seeks to derive fees or revenue sharing from Class III gaming on Indian lands, does the Indian Gaming Regulatory Act require a tribal-state compact to authorize Class III gaming activities that are specifically prohibited by state law?
Pursuant to section 16.01(3), Florida Statutes, the Attorney General is required to give an official opinion to the Speaker of the House of Representatives on any question of law relating to the Speaker's official duties.[1]
In sum, it is my opinion, in light of the greater weight of federal case law and the Department of the Interior's interpretation of IGRA, that the Class III gaming activities subject to mandatory negotiations between a state and an Indian tribe do not include those specifically prohibited by state law. While a tribe must derive a valuable economic benefit commensurate with the payment of fees or revenue sharing, I cannot conclude that granting prohibited Class III games is the only valuable economic benefit that may be offered by a state.
 Question One
Florida has a longstanding public policy restricting gambling within this state. Article X, section 7 of the Florida Constitution provides that "[l]otteries, other than the types of pari-mutuel pools authorized by law . . . are hereby prohibited in this state." The electorate created a limited exception to the constitutional prohibition in 1984 to permit the state to operate lotteries; the Legislature has enacted a rigorous regulatory scheme governing pari-mutuels.[2] In 2004, the constitution was amended to provide a limited exception to the gambling prohibition to permit slot machines only at licensed pari-mutuel facilities in Broward and Miami-Dade counties, upon approval of the voters of those counties.[3] Only Broward County voters approved such machines at qualified pari-mutuel facilities within that county.
The Legislature has the power to prohibit or regulate all other forms of gambling[4] and has prohibited most forms of gambling in Chapter 849, Florida Statutes. For example, section 849.01, Florida Statutes, provides:
"Whoever by herself or himself, her or his servant, clerk or agent, or in any other manner has, keeps, exercises or maintains a gaming table or room, or gaming implements or apparatus, or house, booth, tent, shelter or other place for the purpose of gaming or gambling or in any place of which she or he may directly or indirectly have charge, control or management, either exclusively or with others, procures, suffers or permits any person to play for money or other valuable thing at any game whatever, whether heretofore prohibited or not, shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s.775.083, or s. 775.084."
While Chapter 849, Florida Statutes, authorizes cardrooms located at licensed pari-mutuel facilities where only poker or dominoes may be played in a nonbanking manner,[5] section 849.08, entitled "Gambling," states:
"Whoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083."
Congress passed IGRA in 1988 to provide, inter alia, a statutory basis for the operation of gaming on Indian lands.[6] Regulations promulgated under IGRA provide the following definition of Class III gaming:
"Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to:
 (a) Any house banking game, including but not limited to-
 (1) Card games such as baccarat, chemin de fer, blackjack (21), and pai gow (if played as house banking games);
 (2) Casino games such as roulette, craps, and keno;
 (b) Any slot machines as defined in 15 U.S.C. 1171(a)(1) and electronic or electromechanical facsimiles of any game of chance;
 (c) Any sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai; or
 (d) Lotteries."[7]
Under IGRA, in order to conduct Class III gaming on Indian lands, a tribe must seek to negotiate a compact with the state in which the gaming would occur.[8] IGRA further provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . located in a State that permits such gaming for any purpose by any person, organization, or entity. . . ."[9] If the tribe and the state have not reached an agreement on a compact after 180 days of negotiations, the tribe may file a lawsuit in federal district court claiming that the state has failed to negotiate in good faith.[10]
Neither the United States Supreme Court nor the Eleventh Circuit Court of Appeals has addressed the extent of Class III gaming to which a tribe is entitled under IGRA. The issue, however, has been addressed in other circuits.
The Second Circuit Court of Appeals in Mashantucket Pequot Tribe v.State of Connecticut,[11] was one of the first federal appeals courts to interpret the scope of IGRA's "permitted" gaming. In that case, the Tribe sought to expand its gaming activities to include Class III games Connecticut law permitted for certain nonprofit organizations, but otherwise prohibited. The court held that Connecticut must negotiate as to those games because by allowing nonprofit organizations to conduct specified Class III activities that were otherwise prohibited by state law, Connecticut "permitted" those activities under IGRA.
In Cheyenne River Sioux Tribe v. State of South Dakota,[12] the court concluded that "[t]he `such gaming' language of25 United States Code section 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming it does not presently permit." The Tribe argued that because the state allowed video keno, it must also negotiate on traditional keno. The Eighth Circuit Court of Appeals disagreed, reasoning that the two types of keno are "fundamentally different" and that IGRA "does not require the state to negotiate with respect to forms of gaming it does not presently permit."[13]
Subsequently, the Ninth Circuit Court of Appeals in Rumsey IndianRancheria of Wintun Indians v. Wilson,[14] employed the "plain meaning" rule of statutory interpretation under which the plain meaning of legislation is generally conclusive, and determined that the word "permit" used in 25 United States Code section 2710(d)(1)(B) is unambiguous. As such, the court held, "IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming."[15]
The above federal circuit court decisions represent the greater weight of authority in the resolution of this issue. Although the holdings were reached by different analyses, the cases are consistent in concluding that IGRA does not require a state to negotiate over Class III gaming activities that are prohibited by state law.
This office would also note that the federal district court inSeminole Tribe of Florida v. State of Florida,[16] in a case brought by the Seminole Tribe claiming that Class III gaming activities prohibited by state law were nonetheless mandatory subjects for compact negotiations, held that "IGRA does not require all Class III gaming activities to be included in compact negotiations merely because the State permits specific Class III gaming activities in some form."[17]
Although the decision was vacated on jurisdictional grounds,[18] it provides some insight as to how the federal courts in Florida may address this issue.
The Secretary of the Interior has stated in commenting on the proposed rules codified at 25 Code of Federal Regulations Part 291:
 "IGRA thus makes it unlawful for Tribes to operate particular Class III games that State law completely and affirmatively prohibits. Courts have determined that a State therefore has no duty to negotiate with respect to such games. See Rumsey Indian Rancheria, supra."[19] (e.s.)
Thus, it appears that it is the position of the Secretary of Interior that IGRA does not require a state that authorizes some, but not all, Class III gaming activities, to negotiate with a tribe over Class III gaming activities prohibited by state law.
It is, therefore, my opinion, in light of the greater weight of federal case law and the Department of the Interior's interpretation of IGRA, that Class III gaming activities subject to mandatory negotiations between a state and an Indian tribe do not include those specifically prohibited by state law.
 Question Two
Under IGRA, the state is entitled to be reimbursed for the costs of any regulatory activities.[20] However,25 United States Code section 2710(d)(4) provides:
 "Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment."
IGRA does not address whether a tribal-state Class III gaming compact may include provisions for sharing gaming revenues with the state. However, the Department of the Interior has approved revenue-sharing provisions in some tribal-state compacts.[21] In Coyote Valley Band ofPomo Indians v. State of California (In re Indian Gaming Related CasesChemehuevi Indian Tribe),[22] the Tribe sued the state concerning certain proposed revenue sharing provisions where the state offered Class III gaming not otherwise permissible in the state in exchange for such provisions. The Ninth Circuit held:
 "Where, as here, however, a State offers meaningful concessions in return for fee demands, it does not exercise "authority to impose" anything. Instead, it exercises its authority to negotiate, which IGRA clearly permits. See S. REP. NO. 100-446, at 13 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3083 (describing the compacting process as a "viable mechanism for setting various matters between two equal sovereigns") . . . If . . . offered concessions by a State are real, s. 2710(d)(4) does not categorically prohibit fee demands.[23] (emphasis supplied in original)
The Department of the Interior stated its position in 2003:
 "To date, the Department has only approved revenue sharing payments that call for tribal payments when the State has agreed to provide [a] valuable economic benefit of what the Department has termed substantial exclusivity for Indian gaming in exchange for the payment. As a consequence, if the Department affirmatively approves a proposed compact, it has an obligation to ensure that the benefit received by the State is equal or appropriate in light of the benefit conferred on the tribe."[24]
Nothing in IGRA defines the consideration required for revenue-sharing payments. Therefore, I cannot conclude that granting prohibited Class III games is the only valuable economic consideration that may be offered by the state in return for fees or revenue sharing pursuant to a tribal-state compact.
Sincerely,
Bill McCollum
Attorney General
[1] While this office has not been asked to express an opinion on whether legislative ratification of a gaming compact is required under Florida law, it has been reported that the Governor will submit the compact to the Florida Legislature for ratification. Crist is Gamblingon Seminole Deal, Mary Ellen Klaus, Miami Herald, August 24, 2007;http://www.miamiherald.com/519/story/213526.html.
[2] See generally Ch. 550, Fla. Stat., providing a licensing and regulatory scheme for pari-mutuels in this state.
[3] See Art. X, s. 15 and s. 23, Fla. Const., respectively. Andsee Ch. 551, Fla. Stat., regulating the slot machines authorized pursuant to Article X, section 23, Florida Constitution.
[4] See Seminole Tribe of Florida v. Butterworth, 658 F.2d 310 (5th Cir. 1981), cert. denied, 455 U.S. 1020, 102 S. Ct. 1717,72 L. Ed. 2d 138 (1982).
[5] See s. 849.086(2)(a), Fla. Stat., defining "Authorized game."And see s. 849.085, Fla. Stat., allowing certain penny-ante games to be played only in a dwelling or facilities of organizations that are tax-exempt under s. 501(c)(7) of the Internal Revenue Code.
[6] 25 U.S.C. s. 2702(1).
[7] See 25 C.F.R. s. 502.4.
[8] 25 U.S.C. s. 2710(d)(3)(A).
[9] 25 U.S.C. s. 2710(d)(1)(B).
[10] 25 U.S.C. s. 2710(d)(7)(B)(i).
[11] 913 F.2d 1024, 1029 (2nd Cir. 1990).
[12] 3 F.3d 273 (8th Cir. 1993).
[13] Id. at 279-280.
[14] 64 F.3d 1250, 1257 (9th Cir. 1994), cert. denied sub nom., SycuanBand v. Wilson, 521 U.S. 1118, 117 S. Ct. 2508, 138 L. Ed. 2d 1012
(1997).
[15] 64 F.3d at 1258.
[16] Case No. 91-6756-Civ-Marcus, 1993 U.S. Dist. Lexis 21387 (S.D. Fla. Sept. 22, 1993).
[17] Id. at 59-60.
[18] Seminole Tribe of Florida v. Florida, 517 U.S. 44,116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996).
[19] 63 Fed. Reg. 3289, 3293 (Jan. 22, 1998).
[20] 25 U.S.C. s. 2710(d)(3)(C)(iii) (allowing as a Class III gaming compact provision "the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity").
[21] See 25 U.S.C. s. 2710(d)(3)(B) which requires the Secretary of the Interior to approve any Class III gaming compact entered into by a tribe and a state before it becomes effective.
[22] 331 F.3d 1094 (9th Cir. 2003).
[23] Id. at 1112.
[24] See Oversight Hearing On the Indian Gaming Regulatory Act of 1988before the Senate Comm. on Indian Affairs, 108th Cong. 3 (2003) (testimony of Aurene M. Martin, Acting Assistant Secretary-Indian Affairs, Department of the Interior, July 9, 2003), available at thissite. One example of substantial exclusivity mentioned in Ms. Martin's statement involves "a State where there might be a limited class III authorization within the State for gaming, but the tribe is bargaining for an expanded scope of gaming." Id. at 4.